**BAKER BOTTS L.L.P.**
Wayne O. Stacy (SBN 314579)
wayne.stacy@bakerbotts.com
Sarah J. Guske (SBN 232467)
sarah.guske@bakerbotts.com
101 California St., Suite 3600
San Francisco, CA 94111
Telephone: 415.291.6200
Facsimile: 415.291.6300

**BAKER BOTTS L.L.P.**
Amy K. Liang (SBN 291910)
amy.liang@bakerbotts.com
1001 Page Mill Rd.,
Building One, Suite200
Palo Alto, CA 94304
Telephone: 650.739.7500
Facsimile: 650.739.7699

**BAKER BOTTS L.L.P.**
Michelle J. Eber (*pro hac vice*)
michelle.eber@bakerbotts.com
One Shell Plaza
910 Louisiana Street
Houston, TX 77002
Telephone: 713.229.1223
Facsimile: 713.229.7923

**BAKER BOTTS L.L.P.**
Lauren J. Dreyer (*pro hac vice*)
lauren.dreyer@bakerbotts.com
The Warner, 1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
Telephone: 202.639.7823
Facsimile: 202.639.1153

Attorneys for Defendant
TWILIO INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TELESIGN CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>TWILIO INC.,<br><br>　　　　　Defendant. | **Case No.** 3:18-CV-03279-VC-SVK<br><br>**DEFENDANT TWILIO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS THAT THE ASSERTED CLAIMS OF THE ASSERTED PATENTS ARE INVALID UNDER 35 U.S.C. § 101**<br><br>Date: September 20, 2018<br>Time: 10 a.m.<br>Judge: Hon. Vince Chhabria<br>Place: Courtroom 4 – 17th Floor |

<u>**TABLE OF CONTENTS**</u>

**Page**

I.   INTRODUCTION ........................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................... 2

    A.   '034 Patent ........................................................................................... 2

        1.   '034 Patent's Alleged Invention ......................................... 3

        2.   The PTO's § 101 Findings .................................................. 4

        3.   State of the Art in 2005 ...................................................... 4

    B.   '920 Patent Family ............................................................................. 5

        1.   State of the Art in 2006 ...................................................... 5

III. LEGAL STANDARD .................................................................................... 6

IV.  TWILIO'S MOTION SHOULD BE GRANTED BECAUSE THE CLAIMS OF THE ASSERTED PATENTS LACK PATENT-ELIGIBLE SUBJECT MATTER ............. 8

    A.   The Asserted Claims of the '034 Patent Are Invalid Under § 101 ............................... 8

        1.   *Alice* Step-One: The Asserted Claims Are Directed to an Abstract Idea ........... 8

        2.   *Alice* Step-Two: The Asserted Claims Lack an Inventive Concept.................... 12

        3.   TeleSign's Previous Claim Construction Arguments Do Not Bar an Ineligibility Finding ......................... 15

        4.   The Dependent Claims Also Lack Subject Matter Eligibility ........................... 15

    B.   The Asserted Claims of the '920 Patent Family Are Invalid Under § 101 .................... 16

        1.   Claim 1 of the '920 Patent Is Representative for Purposes of § 101. ................ 17

        2.   *Alice* Step-One: The Asserted Claims Are Directed to an Abstract Idea .......... 17

        3.   *Alice* Step-Two: The Asserted Claims of the '920 Patent Family Lack an Inventive Concept ..................... 20

        4.   TeleSign's Previous Claim Construction Arguments Do Not Bar an Ineligibility Finding ......................... 23

        5.   The Dependent Claims Also Lack Subject Matter Eligibility ........................... 24

V.   CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
890 F.3d 1354 (Fed. Cir. 2018)......................................................................7, 12

*Accenture Global Servs. v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013).........................................................................14

*Alice Corp. Pty. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)............................................................................ passim

*Asghari-Kamrani v. United Servs. Auto. Ass'n*,
No. 2:15cv478, 2016 WL 3670804 (E.D. Va. July 5, 2016) ...................8, 15, 17, 23

*Automated Tracking Sols., LLC v. Coca-Cola Co.*,
723 F. App'x 989 (Fed. Cir. 2018) ...................................................................7, 12

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017)....................................................................5, 12, 22

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*,
687 F.3d 1266 (Fed. Cir. 2012)...................................................................7, 11, 23

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)............................................................................7

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014)................................................................... passim

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
No. 17-cv-05928-YGR, 2018 WL 1610690 (N.D. Cal. Apr. 3, 2018) ....................7

*Comcast IP Holdings v. Sprint Commc'ns*,
No. 12-205-RGA, 2014 WL 3542055 (D. Del. July 16, 2014) .............................13

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014).................................................................. passim

*Cyberfone Sys. LLC v. CNN Interactive Grp., Inc.*,
558 Fed. App'x 988 (Fed. Cir. 2014) (unpublished) ...................................... passim

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011)..........................................................9, 17, 18, 21

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)...............................................................10, 11, 19

*Diamond v. Diehr*,
450 U.S. 175 (1981).................................................................................................25

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)...................................................................... passim

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016).....................................................10, 11, 12, 19

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*,
Nos. C–13–04513, 2014 WL 4802426 (N.D. Cal. Sept. 26, 2014) .............5, 12, 22

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016)..........................................................9, 12, 17, 19

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016).......................................................................6

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)........................................................... passim

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015)........................................................... passim

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
No. 2017-1147, 2017 WL 5041460 (Fed. Cir. Nov. 3, 2017) (unpublished) ..........8, 14, 18, 21

*Intellectual Ventures I LLC v. Symantec Corp.*,
725 F. App'x 976 (Fed. Cir. 2018) .......................................................................7

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016)........................................................... passim

*Intellectual Ventures II LLC v. JP Morgan Chase & Co.*,
No. 13–cv–3777 (AKH), 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015)....................15, 19, 23

*Interval Licensing LLC v. AOL, Inc.*,
No. 2016-2502, 2018 WL 3485608 (Fed. Cir. July 20, 2018)......................................7, 18, 25

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016)....................................................................12, 18

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016)....................................................................12

*OpenTV, Inc. v. Apple Inc.*,
No. 5:15-cv-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016) ..................9, 15, 19, 23

*SAP Am., Inc. v. Investpic, LLC*,
890 F.3d 1016 (Fed. Cir. 2018)......................................................................7

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)....................................................................................10, 14, 22

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)......................................................................................10, 17, 19

*Uniloc USA, Inc. v. Apple Inc.*,
    No. C 18-00358 WHA, 2018 WL 2287675 (N.D. Cal. May 18, 2018)....................................7

## STATUTES

35 U.S.C. § 101............................................................................................................... passim

35 U.S.C. § 103..................................................................................................................6, 22

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on September 20, 2018, at 10 a.m., or as soon thereafter as the matter may be heard, in Courtroom 4 - 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Twilio Inc. ("Twilio") moves the Court for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

Twilio seeks judgment on the pleadings under Federal Rule of Civil Procedure 12(c) because each of the asserted patent claims is invalid under 35 U.S.C. § 101 (*Alice*).

## I. INTRODUCTION

TeleSign asserts four patents, all of which are directed to reducing fraudulent account activity. As TeleSign previously acknowledged in another Court filing: "***The idea of detecting fraudulent account activity is an abstract idea***. It is a conventional business practice that companies have performed in one way or another for as long as they have had customer accounts." (Declaration of Wayne O. Stacy In Support of Twilio Inc.'s Motion for Judgment on the Pleadings under § 101 ("Stacy Decl."), Ex. 1 at 6 (emphasis added).)[1] Yet even after this admission, TeleSign continues to assert its own patents directed at the abstract idea of fraud detection. TeleSign's asserted claims rely on generic technology—websites, web forms, telephones—and do not recite an "inventive concept" sufficient to overcome the abstract nature of the claims. Implementing abstract fraud-prevention ideas on generic computer components does not save TeleSign's claims from *Alice* and its progeny.

TeleSign's Patent No. 7,945,034 (Ex. 2, "'034 patent") is directed to reducing fraudulent account creation by using characteristics of the user's telephone number. In describing the gist of the '034 invention to the Patent Trial and Appeals Board ("PTAB"), TeleSign proclaimed that the '034 patent inventors "found a new way to use a provided phone number." (Ex. 3 at 5.) That new use, according to TeleSign, "was to use characteristics of the phone number itself as a trust indicator and to base registrations of users on the electronically determined characteristic of the phone number associated with a received telephone number." (Ex. 3 at 5-6; *see also* Ex. 4 at 4; Dkt. No. 118 at 2.) This idea is abstract under *Alice*. The only technology recited in the '034

---

[1] Reference herein to "Ex." refers to exhibits to the Stacy Declaration.

claims involves "electronically" determining and a generic "communications network." But *Alice* and its progeny make clear that taking an abstract idea and saying "do it on a computer" does not save otherwise abstract ideas.

The other three asserted patents—U.S. Patent Nos. 8,462,920, 8,687,038, and 9,300,792 (Exs. 5-7, collectively, "the '920 patent family")—share a common specification and include very similar claims. The entire family focuses on the abstract idea of fraud prevention. During the IPR process, TeleSign explained that these patents "prevent[ed] fraudulent website registrations, such as attempts by fraudsters to pass off false registration information as legitimate." (Ex. 8 at 3; Ex. 9 at 3; Ex. 10 at 6.) The '920 patent family approaches fraud detection by verifying a user once, and then verifying them again after something happens— generically referred to as a "notification event" in the claims. For instance, a user first registers online for a bank account and is required to enter a verification code to complete the registration. Next, some predefined event happens, like an attempted money transfer above a $500 limit, and the bank then re-verifies the user. Calling a user's phone to verify the user's identity and then doing the same thing again after some event happens is an abstract idea under *Alice*. TeleSign's simple identity verification process does not solve a technical problem. Rather, it is a solution to a business problem. TeleSign compared its claimed fraud solution to the process used by pizza parlors to prevent fraudulent orders—in the inventor's own words, "TeleSign's patent-pending verification systems has transferred this pizza concept to the high-tech world." (Ex. 11.) Moving a solution to the Internet does not save a claim under *Alice*. Accordingly, the claims are invalid.[2]

## II.    FACTUAL BACKGROUND

### A.    '034 Patent

The '034 patent, titled "Process for Determining Characteristics of a Telephone

---

[2] In 2015, Twilio filed a Rule 12(c) motion under § 101. (Dkt. No. 87.) The Central District court noted the recently decided *Alice* decision and denied without prejudice, concluding that claim construction was needed. (Dkt. No. 123 at 3 (citations omitted).) But no construction could salvage these patents, and this Court now has the benefit of four IPR proceedings of these patents, during which claim interpretation was addressed and TeleSign made relevant admissions as to claim scope. Twilio also challenged the '792 patent claims under § 101 in a covered business method review petition at the PTAB, but TeleSign disclaimed several claims to avoid § 101 review. (Ex. 12 at 10-11; Ex. 13 at 2.) Thus, no court or PTAB panel has previously determined patent eligibility under § 101.

Number," was filed on October 31, 2005. As the title suggests, the '034 patent focuses on ways to use a telephone number. Claim 1 of the '034 patent is reproduced below. Immediately apparent is that the claim uses only generic technology that was well known in 2005.

> [1.a] 1. A process for telephonically registering a user over one or more communication networks through determining characteristics of a telephone number, comprising the steps of:
>
> [1.b] receiving a telephone number;
>
> [1.c] electronically determining the type of phone, the phone carrier and geographic characteristics associated with the telephone number;
>
> [1.d] connecting to a telephone associated with the telephone number through at least one of the communication networks;
>
> [1.e] communicating a verification message with the telephone over at least one of the communication networks; and
>
> [1.f] registering the user through at least one of the communication networks based on the type of phone, the phone carrier, the geographic characteristics associated with the telephone number and the verification message.

### 1.     '034 Patent's Alleged Invention

The '034 patent acknowledges that requiring website users to identify themselves to prevent fraud was well-known in 2005. (Ex. 2 at 1:14-18.) The patent also acknowledges that verifying a user's identity was "fundamental" as of 2005. (*Id.* at 1:30-34 ("Authentication is fundamental to every Internet transaction. Individuals and businesses who wish to engage in trade online must authenticate themselves by reliably establishing their identity, and presenting credentials as proof of that identity.").) The patent also admits that using phone numbers during registration was already known in 2005. (*Id.* at 3:56-58.)

TeleSign's alleged contribution to the crowded field of online authentication is the use of certain phone number characteristics during registration. (Ex. 3 at 5 ("In one sense, the inventors found a new way to use a provided phone number.").) TeleSign summed up the idea of the '034 patent during the 2016 briefing on § 101:

> The '034 patent's inventors thought of the concrete ***idea to use a phone number for something other than a way to contact people: to use its attributes as a trust indicator—basing registration on, for example, the user's phone carrier and other characteristics***.

(Dkt. No. 118 at 2 (emphasis added); *see also* Ex. 3 at 5-6; Ex. 4 at 4.)

During the IPR proceeding, the PTAB, however, found that registering users based on characteristics of a phone number was known in the art. (Ex. 14 at 11-12 (citing Ex. 15).) TeleSign distinguished this prior art based on the number of characteristics TeleSign's alleged invention considered. The prior art only considered **two** phone-number characteristics: geography and phone type. (Ex. 15 at 9:2-13.) As TeleSign told the PTAB, TeleSign's alleged invention considered **three** phone-number characteristics rather than **two**. (*See* Ex. 4 at 1, 8-27, 38-49, 50, 54-74.)

## 2. The PTO's § 101 Findings

During the '034 patent's prosecution, the PTO twice rejected all claims under § 101 before the landmark *Alice* decision. The PTO found the claims to be an unpatentable mental process:

> For example *the process to register a user including steps of receiving, determining, connecting and registering is of sufficient breadth that it would be reasonably interpreted as a series of steps completely performed mentally, verbally or without a machine*.

(Ex. 16 at 28 (emphasis added).) To overcome the rejections, TeleSign amended the claims to include (1) a "communication network;" (2) that the "communicating" and "registering" steps occur over "at least one of the communication networks;" and (3) that the determining step be performed "electronically." (*Id.* at 14, 34-40.)

## 3. State of the Art in 2005

By 2005, the process of using "credentials" for verifying identity was "fundamental to every Internet transaction." (Ex. 2 at 1:30-34.) The PTAB and the prior art considered during the IPRs confirm that as of 2005, registration processes used phone numbers and characteristics associated with a phone number for verifying identity. (Ex. 17 at 23; Ex. 15 at 9:2-13.) Registration processes used geographic location and phone type (which by 2005 included mobile or VOIP, instead of just landline). (Ex. 4 at 8-27, 38-49, 50, 54-74; Ex. 14 at 11-12; Ex. 17 at 23; Ex. 15 at 9:2-13; Ex. 31 ¶ 35-46.)[3] TeleSign did not appeal and the proceedings are now

---

[3] And since at least the late 1990s, Neustar and the North American Numbering Plan Administration (NANPA) maintained a record of "carrier identification codes." (Exs. 18, 19.)

considered part of the intrinsic record. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017); *Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, Nos. C–13–04513, 2014 WL 4802426, at *4 (N.D. Cal. Sept. 26, 2014).

## B. '920 Patent Family

The '920 patent family shares the title "Registration, Verification and Notification System" and claims a priority date of October 5, 2006. Claim 1 of the '920 patent is representative and reproduced below in a two-column format to show the overlap between elements. Notice the similarity between the gray boxes—illustrating verify and re-verify steps.

| | |
|---|---|
| [1.a] 1. A verification and notification process, comprising: | [1.d] establishing a notification event associated with the registrant; |
| [1.b] receiving information responsive to at least part of a registration form that is presented to the registrant on a web-site, the received information including at least one registrant electronic contact; | [1.e] identifying an occurrence of the established notification event; and |
| [1.c] verifying a received registrant electronic contact, wherein verifying the received registrant electronic contact includes: | [1.f] after identifying the occurrence of the established notification event, re-verifying the registrant electronic contact, wherein re-verifying includes: |
| [1.c.i] establishing a first telephonic connection with the registrant using the received registrant electronic contact; | [1.f.i] establishing a second telephonic connection with the registrant using the verified registrant electronic contact; |
| [1.c.ii] communicating a first communicated verification code to the registrant through the first telephonic connection; and | [1.f.ii] communicating a second communicated verification code to the registrant through the second telephonic connection; |
| [1.c.iii] receiving a first submitted verification code after it is entered by the registrant via the web-site and verifying the received registrant electronic contact if the first submitted verification code is the same as the first communicated verification code; | [1.f.iii] receiving a second submitted verification code that is entered by the registrant via the web-site; and [1.g] re-verifying the registrant electronic contact if the second submitted verification code is the same as the second communicated verification code. |

Simply put, the '920 family combats fraud with known verification methods and simple notification messages. The claims only require verification, notification, and re-verification.

### 1. State of the Art in 2006

As previously mentioned, by 2006, verifying a user's identity was "fundamental to every

Internet transaction." (Ex. 5 at 1:30-34.) In TeleSign's own words, TeleSign was simply using the Internet to facilitate authentication techniques long-used by pizza parlors to prevent fraudulent orders. (Ex. 11.) Two-factor authentication was also well-known before 2006, and verification messages sent to a user's telephone were prevalent. For example, during the IPRs of the '920 patent family, TeleSign conceded that the use of codes for verifying users was well-known. (*See, e.g.*, Ex. 8 at 1-2, 5-6, 25; Ex. 20 at 9-12, 17-18.) As another example, by at least 2002, "two-factor authentication" using mobile phones and SMS (short message service) "to quickly deliver one-time access codes to end users for secure entry into Web-based applications" was in widespread use. (*See* Ex. 21.) These early systems operated in a materially identical way as TeleSign's patents:

> Visitors to a website equipped with RSA Mobile enter their username and password in the usual way. ***The system then searches for the mobile phone number associated with each user name, and sends a one-time access code in an SMS to the mobile phone***. The user then types the access code to log in."

(Ex. 22 (emphasis added).)

And as another example that two-factor authentication and verification codes were known in 2006, the PTO repeatedly rejected claims of the '920 patent application that included only a single verification step as obvious under 35 U.S.C. § 103. (Ex. 23 at 31-32 (citing Ex. 24 at 8:17-22, 8:31-45, 9:21-27, Ex. 25 at 2:48-63, and Ex. 26).) To overcome those rejections, TeleSign added a second verification step upon occurrence of a notification event. (*See* Ex. 23 at 54, 82-83.)

The '792 patent contains all of the essential steps as the other asserted '920 family patents—verification, notification, and re-verification. The PTAB invalidated all challenged claims of the '792 patent, a result which TeleSign accepted and declined to appeal. (*See* Ex. 20 at 9-12 (citing Exs. 27-28).) The IPR proceedings are now part of the prosecution history for the family. And these proceedings further confirm that the elements of the '920 patent family were all known prior to 2006.

## III.   LEGAL STANDARD

A district court can determine eligibility under § 101 at the pleading stage. *Genetic Techs.*

*Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016). Claim construction is not required. *See Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1277 (Fed. Cir. 2012).

In the first step of the Supreme Court's two-step framework (*Alice* step-one), the court "determine[s] whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). This decision is a pure issue of law. If the *Alice* step-one analysis reveals that the patent is directed to an abstract idea, it is invalid unless the court finds that the claims recite an "'inventive concept.'" *Id.* at 2355. Adding "generic computer elements performing generic computer tasks" is insufficient to save an abstract idea. *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014). Patent eligibility is a question of law, which may be based on underlying facts. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Whether a claim element is conventional is a question of fact. *Id.* at 1369.[4] But "where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1356 (Fed. Cir. 2018). Genuine questions of fact do not exist if the claims do not incorporate the particular technological features that supply an inventive concept. *See id.*

Courts often turn to other court decisions to understand the boundaries of abstract ideas and inventive concepts. The decisions below related directly to the concepts in TeleSign's asserted claims—each has been rejected as *both* abstract and not inventive:

- **Collecting and analyzing information.** *E.g. Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d

---

[4] Numerous courts (with approval from the Federal Circuit) have granted § 101 motions post-*Berkheimer* because no questions of facts existed at *Alice* step-two. *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, No. 2016-2502, 2018 WL 3485608, at *9 (Fed. Cir. July 20, 2018); *SAP Am., Inc. v. Investpic, LLC*, 890 F.3d 1016, 1023 (Fed. Cir. 2018); *Intellectual Ventures I LLC v. Symantec Corp.*, 725 F. App'x 976, 978 (Fed. Cir. 2018); *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 995 (Fed. Cir. 2018); *Uniloc USA, Inc. v. Apple Inc.*, No. C 18-00358 WHA, 2018 WL 2287675, at *7 (N.D. Cal. May 18, 2018); *Cellspin Soft, Inc. v. Fitbit, Inc.*, No. 17-cv-05928-YGR, 2018 WL 1610690, at *10 n.12 (N.D. Cal. Apr. 3, 2018).

1350, 1353-54 (Fed. Cir. 2016) (holding that "process of gathering and analyzing information of a specified content, then displaying the results" is abstract and not inventive).

- **Characterizing information based on criteria.** *E.g. Intellectual Ventures I LLC v. Erie Indemnity Co.*, No. 2017-1147, 2017 WL 5041460, at *3-4 (Fed. Cir. Nov. 3, 2017) (unpublished) (holding that "identifying and characterizing files based on one of three selection criteria" does not satisfy § 101); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016).

- **Storing information.** *E.g. Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known," and "humans have always performed these functions.").

- **Sending and receiving information, whether using a computer, networks, or telephones**. *E.g. buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network . . . is not even arguably inventive."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612-13 (Fed. Cir. 2016) (finding claims reciting a "digital pick up unit in a telephone unit" and a "server" nevertheless directed to an abstract idea); *Cyberfone Sys. LLC v. CNN Interactive Grp., Inc.*, 558 Fed. App'x 988, 993 (Fed. Cir. 2014) (unpublished) (finding claimed telephone did not supply inventive concept).

- **Online authentication and verification using a code**. *E.g. Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15cv478, 2016 WL 3670804, at *4-5 (E.D. Va. July 5, 2016) (invalidating claims directed to transmitting a code or token to a user to be used to access a system).

## IV.   THE ASSERTED CLAIMS LACK PATENT-ELIGIBLE SUBJECT MATTER

### A.   The Asserted Claims of the '034 Patent Are Invalid Under § 101

TeleSign asserts claims 1-4, 6-7, 9, and 11-12 of the '034 patent in this case. Each asserted claim is invalid under § 101 for the reasons set forth below.

#### 1.   *Alice* Step-One: The Asserted Claims Are Abstract

##### a.   **The claims are directed to generalized steps for performing the abstract idea of registering a user.**

TeleSign describes the idea claimed in the '034 patent as using phone number "attributes

as a trust indicator—basing registration on, for example, the user's phone carrier and other characteristics." (Dkt. No. 118 at 2.) The patent states that the object of the claimed idea is fraud detection. (Ex. 2 at Abstract.) The claimed fraud detection idea when taken as a whole is abstract. When confronted with similar claims directed to collecting and testing information about a user before providing access to a system, courts have routinely invalidated the patents. *See, e.g.*, *OpenTV, Inc. v. Apple Inc.*, No. 5:15-cv-02008-EJD, 2016 WL 344845, at *5 (N.D. Cal. Jan. 28, 2016) ("The practice of controlling access to information by verifying credentials . . . is neither novel nor specific to interactive television systems. It is a long-standing and well-understood business practice that predates the internet."); *see also FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) (rejecting fraud detection claims under § 101 for reciting a process that humans have done in their minds for decades or centuries); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011). And TeleSign previously argued that claims similar to the '034 patent claims were abstract: "***The idea of detecting fraudulent account activity is an abstract idea***. It is a conventional business practice that companies have performed in one way or another for as long as they have had customer accounts." (Ex. 1 at 6 (citations omitted) (emphasis added).)

The individual claim elements confirm abstractness.[5] In its 2016 briefing, TeleSign identified the core ideas of the '034 patent as: **(1)** "electronically determining characteristics of a phone number" (element 1[c]); and **(2)** "registering a user" (element 1[f]). (Dkt. No. 118 at 14-15.) For the "electronically determining" idea, the "determining" step is a mental-activity equivalent that simply describes the high-level process of collecting information based on a phone number. TeleSign alleges that "determining" phone number characteristics is satisfied by an old-fashioned database lookup. (Dkt. No. 176-2 ¶¶ 151, 160.) A database lookup, however, is abstract because it is simply a computer-assisted mental step of searching for and collecting information. *Elec. Power*, 830 F.3d at 1353-54; *Content Extraction*, 776 F.3d at 1347. Adding "electronically" to the determining step does not salvage the claim after *Alice*. *See Alice*, 134 S.

---

[5] For ease of reference, Twilio identifies the claim elements by element number. Twilio attaches Appendices A-B, which shows the mapping of element number to the claim element for each asserted claim.

Ct. at 2358; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014).

For "registering," element 1[f] recites registering a user based on both the phone-number characteristics determined in 1[c] and the verification message of 1[e]. According to TeleSign, simply "storing user-specific information" meets the limitation, a construction the PTAB adopted. (Dkt. No. 176-2 ¶ 160; Ex. 17 at 10.) Courts repeatedly hold that storing data is abstract. *Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.") (collecting cases). Making a decision to allow something to happen— deciding to store user-specific information—is the type of mental activity or manual step that the Federal Circuit says is abstract. *See Capital One Bank*, 792 F.3d at 1370.

The remaining elements do not save the claim from abstractness. The receipt of a telephone number (element 1[b]) and communication of a verification message to the telephone (element 1[e]) recite the abstract concepts of receiving and transmitting information. *See buySAFE*, 765 F.3d at 1355. Connecting to the phone to communicate a message (element 1[d]) is also abstract. *Id.*; *see also TLI Commc'ns*, 823 F.3d at 612-13. Having generic computer and phone equipment do what is otherwise a mental process does not save the claim. *Alice*, 134 S. Ct. at 2360; *buySAFE*, 765 F.3d at 1355; *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017).

> **b.  The claims are not a technical solution to a technical problem and do not improve computer functionality.**

An otherwise abstract idea may be found to be non-abstract (1) if the claims recite a technical solution to a technical problem or (2) if it improves computer functionality. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337-39 (Fed. Cir. 2016). Neither saves the '034 patent claims.

The '034 patent does not address a problem rooted in technology and does not improve computer technology. It instead addresses a business problem—detecting fraudulent activity. (Ex. 1 at 6 (citations omitted) ("The idea of detecting fraudulent account activity is an abstract idea. It is a conventional business practice that companies have performed in one way or another for as long as they have had customer accounts.").)

Moreover, verifying the identity of an individual trying to gain access to something is hardly a challenge "particular to the Internet." *DDR Holdings*, 773 F.3d at 1257 (addressing claims directed to "a challenge particular to the Internet"); *see also Capital One Bank*, 792 F.3d at 1371 (limiting *DDR Holdings* to "problems unique to the Internet"). Using information about someone in combination with a code (e.g., pass phrase) to determine whether the person should be permitted to do something has been done for decades and even centuries—from in-person banking access to meetings of the Knights Templar.[6]

TeleSign previously attempted to read the term "real time" into the claims in order to argue that the claims constitute a technical solution because a human would not be able lookup phone number information as fast as a computer. (Dkt. No. 118 at 13-14.) But, no claim recites "real time." And even if "real time" were read into the claims, that addition would not convert the claims into a technical solution to a technical problem. According to TeleSign, "real time" means that the claimed steps would be performed faster than if a human were to perform the steps. (*Id.* at 32.) Both the Supreme Court and Federal Circuit have ruled that using a computer to accomplish a task in real-time is not patent-eligible. *Bancorp Servs.*, 687 F.3d at 1279; *Alice*, 134 S. Ct. at 2352 (invalidating claims directed to "updat[ing] . . . records in real-time as transactions are entered"); *Capital One Bank*, 792 F.3d at 1369.

The '034 patent claims also do not improve computer functionality. The claims do not recite a new or improved computer operation. *Enfish*, 822 F.3d at 1337-39. Rather, the claims recite known technical components for performing the recited steps. For example, the recited "communication networks" are merely providing an information pathway—no unique or improved operation of a communication network is recited. (Ex. 2 at 9:50-53.) The purported invention uses standard networks and phone technology (e.g., voice and texting) according to the specification. (*Id.* at 1:46-49, 8:1-59.) And, according to TeleSign, "electronically determining" phone number characteristics is a simple lookup in a conventional database. (*See supra* Section IV.A.1.a.) The '034 patent claims merely use technology as a tool to perform mental steps

---

[6] *See* Ex. 29, https://en.wikipedia.org/wiki/Monty_Python_and_the_Holy_Grail ("[T]hey arrive at the Bridge of Death and must answer three questions from the bridge-keeper to pass.").

without improving the used technology. *Enfish*, 822 F.3d at 1335-39; *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016); *FairWarning*, 839 F.3d at 1094.

### 2. *Alice* **Step-Two: The Asserted Claims Lack an Inventive Concept**

The claims of the '034 patent are abstract. They are invalid unless under the second *Alice* step the claims "contain "*significantly more* than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355. These are not the types of claims that justify saving.

The specification and intrinsic record are guides in determining what is well-known, routine, and conventional at the time of the invention—2005 for the '034 patent. *Aatrix Software*, 890 F.3d at 1356; *see also Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 995 (Fed. Cir. 2018) (affirming Rule 12 motion under § 101 when specification indicated that claimed components were conventional); *Aylus Networks*, 856 F.3d at 1361; *Evolutionary Intelligence*, 2014 WL 4802426, at *4. Here, the record confirms that the claimed limitations are conventional features of authentication procedures as of 2005. Therefore, the claimed limitations do not meet the exacting "significantly more" standard to transform the abstract idea into patent-eligible subject matter.

The first element, element 1[b], recites the unremarkable step of receiving a telephone number, which was well-known in conventional online registration systems. (Ex. 2 at 1:15-37.) Receiving information is not inventive. *Elec. Power*, 830 F.3d at 1353-54. Likewise, element 1[d] recites the conventional step of connecting networked components. The recited communications networks and telephones are described in the specification as conventional components used for the conventional steps of connecting and communicating information— they have no unique configuration or operation. (Ex. 2 at 1:46-49, 8:1-59.) And element 1[e] simply recites communicating a message over the telephone, which the specification describes as standard SMS or text messages, email, and instant messages. (*Id.* at 4:67-5:12.) Communicating messages over telephones was not inventive in 2005. *buySAFE*, 765 F.3d at 1355; *TLI Commc'ns*, 823 F.3d at 612-13. Accordingly, each of these communications-related limitations are basic features of a typical telephone system that fall far short of providing an inventive concept. *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir.

2016); *see also buySAFE*, 765 F.3d at 1355; *Capital One Bank*, 792 F.3d at 1368; *Cyberfone*, 558 Fed. App'x at 993; *Comcast IP Holdings v. Sprint Commc'ns*, No. 12-205-RGA, 2014 WL 3542055, at *14-15 (D. Del. July 16, 2014).

The remaining two elements, which TeleSign identified in its 2016 briefing as supplying an inventive concept—(1) "electronically determining characteristics of a phone number" (element 1[c]), and (2) "registering a user" (element 1[f])—do not add "significantly more" to the underlying abstract idea. For "electronically determining" (element 1[c]), TeleSign contends this step is performed by a database lookup. (Dkt. No. 176-2 ¶¶ 151, 160.) But nothing recited in the step indicates an inventive database or inventive programming to perform the database lookup. The specification confirms that querying a database for user characteristics was known in 2005. (Ex. 2 at 1:14-29.) The record also confirms that there was nothing inventive about looking for phone characteristics in a database. For example, the IPR confirmed that it was well-known to look for certain characteristics associated with a particular phone number, such as geography and phone type. (Ex. 17 at 20-24; Ex. 15 at 9:2-13.) Moreover, using a computer to look up information, such as characteristics, in a database is not inventive. *Elec. Power*, 830 F.3d at 1353-54.

For "registering a user" (element 1[f]), TeleSign maintained that "registering" meant "storing user-specific data," such that the step of "registering a user . . . based on [the recited characteristics]" meant "using the [recited characteristics] as criteria or factors when storing user-specific data." (Ex. 17 at 10-11; Ex. 4 at 13-14, 37; Dkt. No. 176-2 ¶¶ 140-41.) However, the claimed step does not recite anything inventive about data storage or the criteria used in storing the data. Rather, the specification admits that storing user-specific characteristics was well-known in providing online registration and access. (Ex. 2 at 1:15-29.) Courts have already concluded that storing data is not inventive. *Content Extraction*, 776 F.3d at 1348.

The record also confirms that there was nothing inventive about registering a user-based phone-number characteristics. (Ex. 4 at 8-27, 38-49, 50, 54-74; Ex. 14 at 11-12; Ex. 17 at 23; Ex. 15 at 9:2-13.) TeleSign's alleged secret sauce is that it uses three characteristics instead of the known two characteristics—adding phone carrier to the known use of geography and phone type.

(Ex. 17 at 23 (emphasis added); Ex. 4 at 1 ("When registering users, the challenged claims technologically discriminate online registrations *based on the phone carrier* associated with a received telephone number, whereas [the prior art] does not teach or suggest doing so."), 8-27, 38-49, 50, 54-74; Ex. 15 at 9:2-13.) Unsurprisingly, including a well-known additional characteristic in an otherwise conventional step is not sufficient to demonstrate subject matter eligibility. *Symantec Corp.*, 838 F.3d at 1315 ("While the claims may not have been anticipated or obvious because the prior art did not disclose 'determining . . . whether each received content identifier matches a characteristic' or 'outputting . . . an indication of the characteristic of the data file,' that does not suggest that the idea of 'determining' and 'outputting' is not abstract, much less that its implementation is not routine and conventional."). Under *Alice* and its progeny, using criteria—even multiple criteria—to classify information is not inventive. *Erie Indemnity*, 2017 WL 5041460, at *3-4 (holding that "identifying and characterizing files based on one of three selection criteria" does not satisfy § 101); *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) (finding "set of rules" applied to database of tasks contained only "generalized software components arranged to implement an abstract concept on a computer"); *Symantec Corp.*, 838 F.3d at 1313 (holding that "receiving e-mail (and other data file) identifiers, *characterizing e-mail based on the identifiers*, and communicating the characterization" was not inventive) (emphasis added).

There is likewise nothing inventive when considering the claims "as an ordered combination." The claimed steps operate in their expected order and manner: first receive a phone number, then look up information associated with the phone number in a database, then communicate a verification message, and then register the user based on that information. *See Two-Way Media*, 874 F.3d at 1339 (finding no inventive concept when "claim uses a conventional ordering of steps . . . with conventional technology to achieve its desired result."). The ordered combination adds nothing "because it follows from the underlying idea" of using phone number characteristics for registration—and that the attributes would first need to be determined and the verification message communicated before registering a user with that information. *See Cyberfone*, 558 Fed. App'x at 993.

Moreover, courts have repeatedly found that claims directed to the well-known concepts of security mechanisms using similar common-sense orders of operation for first collecting and then analyzing data to verify a user's credentials do not amount to an inventive concept. *See, e.g.*, *OpenTV*, 2016 WL 344845, at *6; *Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 13–cv–3777 (AKH), 2015 WL 1941331, at *14 (S.D.N.Y. Apr. 28, 2015); *Asghari-Kamrani*, 2016 WL 3670804, at *5 (holding that claims directed to "verify[ing] the identity of a participant to a transaction using a randomly generated code" was an "old method of authentication" that did not amount to an inventive concept). The '034 patent claims' recitation of first "electronically determining" characteristics of a telephone number and then "registering a user" based on those characteristics (i.e., using the characteristics as criteria when storing information) are "old modes of authentication" using generic computer functionality. *See Asghari-Kamrani*, 2016 WL 3670804, at *5.

### 3. TeleSign's Previous Claim Construction Arguments Do Not Bar an Ineligibility Finding

TeleSign raised several claim construction issues that allegedly impact § 101. TeleSign's claim construction arguments for the '034 patent break down into three categories: (1) that the claimed steps must be performed in "real time," (2) that "electronically determining" in the context of accessing information and "electronic database" must be construed, and (3) that "communicating a verification message with the telephone" needs construction. (Dkt. No. 118 at 32-34.) None of these limitations, regardless of construction, convert an otherwise unpatentable abstract idea to patentable subject matter. *See, e.g.*, *Alice*, 134 S. Ct. at 2352 (invalidating claims directed to "updat[ing] . . . records in real-time as transactions are entered"); *Capital One Bank*, 792 F.3d at 1369. For the limited purposes of this motion, Twilio does not contest any of these purported requirements.

### 4. The Dependent Claims Also Lack Subject Matter Eligibility

TeleSign also asserts dependent claims 2-4, 6-7, 9, and 11-14 of the '034 patent. Although the asserted dependent claims add additional limitations, they add nothing non-abstract or inventive that would alter the *Alice* analysis.

Several claims recite further limitations relating to conventional databases. Claims 2 and 3 recite providing access to a database of phone numbers and characteristics of phone numbers and querying that database. (Ex. 2 at claims 2 and 3.) Claims 4 and 6 recite examples of the type of phone characteristics determined in claim 1. (*Id.* at claims 4, 6.) Claim 14 recites adding a phone number and its characteristics to a database. (*Id.* at claim 14.) These dependent claim elements recite typical database features and typical uses of a database—rendering these dependent claims abstract and non-inventive. *Elec. Power*, 830 F.3d at 1354-55; *Content Extraction*, 776 F.3d at 1348.

Several dependent claims recite additional elements relating to receiving and transmitting information. Claim 7 recites examples of different ways a phone number can be received—via form or caller-identification. (Ex. 2 at claim 7.) Claim 9 recites "informing" a third party of the determined phone number characteristics. (*Id.* at claim 9.) Claim 12 recites providing and receiving an online form. (*Id.* at claim 12.) The patent does not describe any of these recited steps as new. Generalized, conventional steps relating to receiving and transmitting information like those in claims 7, 9, and 12 are abstract and conventional. *buySAFE*, 765 F.3d at 1354-55; *Symantec Corp.*, 838 F.3d at 1311, 1314; *TLI Commc'ns*, 823 F.3d at 607, 612-13. Claim 11 recites denying or granting access to a user "upon determining" the characteristics without disclosing a special analysis process. (Ex. 2 at claim 11.) The concept of decision-making based on comparing collected information is the equivalent of a mental activity and is not patent eligible. *Elec. Power*, 830 F.3d at 1354-55. Claim 13 recites additional steps of establishing a telephonic connection, communicating a code, and receiving a code. (Ex. 2 at claim 13.) Just as these types of limitations are insufficient for claim 1 (Section IV.A.1-2), they do not save the dependent claim. And the specification admits that online registration for securing access to websites already existed. (Ex. 2 at 1:14-34.) As further discussed (Section IV.B.3), providing a code during authentication was also well-known. The claim adds nothing to the *Alice* analysis.

## B. The Asserted Claims of the '920 Patent Family Are Invalid Under § 101

TeleSign asserts claims 1-13 and 19-22 of the '920 patent; 1-22 of the '038 patent; and 9 and 18 of the '792 patent. As set forth below, each asserted claim is invalid under § 101.

### 1. Claim 1 of the '920 Patent Is Representative for Purposes of § 101.

All asserted claims of the '920 patent family are directed to the same abstract idea: preventing fraud by using a phone and a code to verify a user's identity. Claim 1 of the '920 patent is materially indistinguishable from the other independent claims in the family (claims 1 and 13 of the '038 patent, and claims 1 and 10 of the '792 patent). The PTAB however has already invalidated both independent claims 1 and 10 of the '792 patent during the IPRs, a final decision that TeleSign did not appeal. As shown in the attached Appendix B, the independent claims of all three patents are substantively identical to representative claim 1 of the '920 patent and thereby to invalidated claims 1 and 10 of the '792 patent.

### 2. *Alice* Step-One: The Asserted Claims Are Abstract
#### a. The claims are directed to generalized steps for performing the abstract idea of verifying a user—twice.

The '920 patent characterizes the purported invention as a "[a] verification and notification" process. (Ex. 5 at 12:20.) Claim 1 of the '920 patent breaks up this abstract idea into a series of basic steps. *See Ultramercial*, 772 F.3d at 714. Stripped of generic components, the alleged invention, taken as a whole, is nothing more than the abstract idea of calling a website user's phone to verify the user's identity and then doing the same thing again after something happens—such as re-verifying when the user tries to withdraw more than $500.

District courts and the Federal Circuit have invalidated similar patents when faced with code-based verification claims like those recited in the '920 patent family. *See, e.g.*, *Asghari-Kamrani*, 2016 WL 3670804, at *4-5 (finding that claims directed to transmitting a code or token to a user to be used to access a system was ineligible subject matter); *FairWarning*, 839 F.3d at 1093 (finding that a method of fraud detection looking for suspicious activity or improper access and resulting in the notification of the account holder if the access is deemed to be potentially fraudulent is not patent eligible).

An examination of the elements of representative claim 1 of the '920 patent further demonstrates that the claimed steps are abstract. *See, e.g.*, *CyberSource*, 654 F.3d at 1371. The majority of the claim language relates to communicating and receiving information via telephone connections or over the generic "network"—including codes, phone numbers or electronic

contact addresses, and notifications. (Appendix B, '920 patent, elements 1[b], 1[c][ii], 1[f][ii], 1[c][iii], 1[f][iii], 1[f].) The transmission or receipt of information over a connection—even through electronic means—is abstract. *Symantec Corp.*, 838 F.3d at 1311, 1314; *Content Extraction*, 776 F.3d at 1347; *see also supra* Section IV.A.1. Similarly, establishing a phone or text message connection (elements 1[c][i], 1[f][i]) is merely the abstract step of connecting a phone to a standard network. *buySAFE*, 765 F.3d at 1355; *Cyberfone*, 558 Fed. App'x at 991-92.

The elements reciting the step of "verifying" that the "received" code (the code entered by the user) is the same as the "communicated" code (elements 1[c][iii], 1[f][iv]) recite no more than a mental step of comparing two numbers. *See Erie Indemnity*, 2017 WL 5041460, at *3-4 (holding that "identifying and characterizing files based on one of three selection criteria" is an abstract idea); *CyberSource*, 654 F.3d at 1370 (holding that comparing data is abstract).

For the steps of establishing and identifying the "notification events" (elements 1[d]-[e]), the claims do not recite any special technical process for establishing the events or detecting whether the events occurred. This high-level claiming technique confirms that the claims are abstract. *See McRO*, 837 F.3d at 1312; *Elec. Power*, 830 F.3d at 1356; *Interval Licensing LLC v. AOL, Inc.*, No. 2016-2502, 2018 WL 3485608, at *7 (Fed. Cir. July 20, 2018). Moreover, the steps of determining a triggering event (a notification event), monitoring for the event, and alerting someone if the event occurs are routine human activities. *Elec. Power*, 830 F.3d at 1352, 1354 (finding claims directed to "detecting and analyzing events" abstract). The '792 patent claims include additional language relating to "notification events," reciting maintaining a record of a notification event, receiving indication that the event occurred (followed by transmitting a message to the telephone number), and receiving an acknowledgment from a user (Appendix B, '792 patent, elements 1[e]-[g].) These limitations merely recite typical storing and communicating limitations, which courts have confirmed are abstract. *Content Extraction*, 776 F.3d at 1347; *buySAFE*, 765 F.3d at 1355.

      **b.**    **The claims are not a technical solution to a technical problem and do not improve computer functionality.**

The '920 patent family claims do not constitute a technical solution to a technical

problem and do not improve computer functionality. (*See supra* Section IV.A.1.b.) The problem purportedly addressed by the '920 patent family—verifying the identity of an individual to gain access to something—is not a problem rooted in technology or particular to the Internet under *DDR Holdings*, 773 F.3d at 1257-59. It is a standard business problem of verifying customers. In a 2005 press release, TeleSign and the inventor embraced that its technology was an Internet implementation of the solution that pizza parlors have been using for years to limit prank pizza orders—calling a customer to confirm legitimacy (Ex. 11):

> There hasn't been much good news in the battle against identity theft lately, with fraudsters staying one step ahead of the game. But don't panic, our old friend the telephone has come to the rescue.
>
> We're all aware of the problem of identity theft, but did you know that your local pizza chain has had a solution for years? You recognize it as the system that prevents little Johnny from having twenty pizzas delivered to your door at midnight: the pizza chain calls you immediately after the order is placed to verify the validity of the order. Because little Johnny is afraid to be caught, he'll think twice about causing this pizza-related havoc.
>
> TeleSign's patent-pending verification system has transferred this pizza concept to the high-tech world. It works like this: after filling out a

Reciting that the claimed process is performed through a "website" ("or interface") is not enough to render the claims a technical solution to a problem particular to the Internet. *Ultramercial*, 772 F.3d at 716. *DDR Holdings* recognized that inclusion of a website does not save otherwise ineligible claims. *DDR Holdings*, 773 F.3d at 1258; *see also OpenTV*, 2016 WL 344845, at *6 (distinguishing verification claims from *DDR Holdings*); *JP Morgan Chase & Co.*, 2015 WL 1941331, at *10-11 (same). The Internet-related limitations in the '920 patent claims are simply a tool to facilitate the generalized steps. *Ultramercial*, 772 F.3d at 716; *FairWarning*, 839 F.3d at 1094. Similarly, the recitation of generic "telephone" and "telephonic connection" components to implement the abstract idea is the equivalent of claiming the abstract idea. *Alice*, 134 S. Ct. at 2360; *TLI Commc'ns*, 823 F.3d at 612-13 (finding claims reciting a "telephone unit" abstract); *Cyberfone*, 558 Fed. App'x at 992 (same); *FairWarning*, 839 F.3d at 1094.

The '920 family patent claims also do not improve computer functionality. *Enfish*, 822

F.3d at 1337-39. Nothing in the claims indicates that the claimed process improves computer or network functionality. The technical components potentially implicated by the claims—telephones—operate as they have for decades. (Ex. 5 at 6:3-22.) Computer and network equipment responsible for the other limitations are also unchanged by the invention.

### 3. *Alice* Step-Two: The Asserted Claims Lack an Inventive Concept

The claims of the '920 patent family fail *Alice* step-two because they contain only routine functionality that does not amount to "*significantly more*," as required under *Alice.* The specification and intrinsic record confirm that the steps of the recited double-verification process were conventional in 2006—the time of the invention. For example, during prosecution of the '920 patent, the PTO determined that a single iteration of the claimed double-verification process was known in the art. (Ex. 23 at 31-32; Ex. 24 at 8:5-54, 9:6-32; Ex. 25 at 2:48-63.) Repeating a well-known process twice does not meet the exacting "significantly more" standard to transform the abstract idea into patent eligible subject matter. The PTAB also confirmed that the repeated verification process was well-known in invalidating several claims of the '792 patent in an IPR. (Ex. 20 at 9-12, 17-18; Ex. 27 at 2:63-67, 5:32-35, 10:62-11:5, 12:56-13:23, 15:8-13.)

Turning to the individual limitations, the first element of '920 claim 1, element (1[b]), recites the conventional step of receiving a telephone number or electronic contact address from a form on a website. There is nothing unconventional about the claimed "registration form" or "website." The specification describes these components as well-known at the time. (Ex. 5 at 1:30-38.) The prior art from the prosecution history further confirm that the element was well-known. (Ex. 23 at 31-32; Ex. 24 at 8:5-36, 9:6-20; Ex. 25 at 2:48-63; Ex. 20 at 9-12, 17-18; Ex. 27 at 2:61-63, 14:46-56.)

Claim 1 next recites the "verifying" step (element 1[c], and its counter-part for "re-verifying" element 1[f]), which includes sub-steps (elements 1[c][i]-[iii], elements 1[f][i]-[iv]). Elements 1[c][i] and 1[f][i] recite the conventional step of establishing a phone or text message connection. The recited telephonic connection and telephones are described in the specification as conventional, used for the unremarkable steps of connecting and communicating information.

They have no inventive configuration or operation. (Ex. 5 at 6:3-22.) The art of record is rife with examples demonstrating that such connections were known and conventional. (Ex. 23 at 31-32; Ex. 24 at 8:17-22, 8:31-45, 9:21-32; Ex. 25 at 2:48-63; Ex. 20 at 9-12, 17-18; Ex. 27 at 2:63-67, 5:32-35, 10:62-11:5, 15:8-13; Ex. 28 ¶¶ 13-18.) Connecting to a telephone or transmitting information over a phone was not inventive in 2006. *buySAFE*, 765 F.3d at 1355; *Cyberfone*, 558 Fed. App'x at 993.

The next elements recite communicating the verification code to the user (elements 1[c][ii], 1[f][ii]) and receiving the code entered by the user (elements 1[c][iii], 1[f][iii])). These "communicating" and "receiving" steps recite the conventional process of communicating data through a telephonic connection. (Ex. 5 at 5:7-17.) TeleSign did not challenge the PTAB's finding that the corollary '792 patent elements were known. (Ex. 20 at 9-12, 17-18; Ex. 27 at 2:63-3:4, 5:32-35, 10:62-11:5, 15:8-42; *see also* Ex. 23 at 31-32; Ex. 24 at 8:17-22, 8:31-45, 9:21-27; Ex. 25 at 2:48-63.) And the transmission of information over a connection is not inventive. *Symantec Corp.*, 838 F.3d at 1311, 1314; *Content Extraction*, 776 F.3d at 1347.

The elements reciting the step of "[re]verifying" that the "received" code is the same as the "communicated" code (elements 1[c][iii] and 1[f][iv]) are directed at comparing information. TeleSign did not challenge that it was known to compare codes in online authentication systems, and the PTAB agreed that comparing codes was known. (Ex. 8 at 1-2, 5-6, 25; Ex. 20 at 9-12, 17-18; Ex. 27 at 2:67-3:4, 15:14-42; Ex. 23 at 31-32, 54, 82; Ex. 25 at 2:48-63; Ex. 21; Ex. 22.) Further, comparing information is not inventive under *Alice*. *See Erie Indemnity*, 2017 WL 5041460, at *5-6 (holding "identifying and characterizing files based on one of three selection criteria" is not inventive); *CyberSource*, 654 F.3d at 1370 (comparing data is not inventive).

The final elements relate to establishing and identifying the "notification events" (elements 1[d]-[e]). But the claims do not recite any special configuration or programming for establishing the events or detecting whether the events occurred. The specification describes the events as well-known and common-sense events for alerting a user to potential fraud (*i.e.*, a withdrawal of more than $1,000, stolen credit cards, etc.). (Ex. 5 at 1:39-57, 10:26-11:35.) The PTAB's findings regarding the corollary limitations in the '792 patent claims confirm that the

limitations were conventional. (Ex. 20 at 9-12, 17-18; Ex. 27 at 12:56-13:23, 11:28-13:23, 16:3-13; Ex. 28 ¶¶ 13-18; Ex. 23 at 31-32, 54, 82; Ex. 26 ¶ 0123.) And detecting the occurrence of a predetermined event is not inventive under *Alice*. *Elec. Power*, 830 F.3d at 1352, 1356 (finding claims directed to "detecting and analyzing events" not inventive).

There is likewise nothing inventive when considering the claims "as an ordered combination." The claimed steps operate in their expected order and manner: receive a phone number, connect with the phone number, communicate a verification code to the phone, and compare the entered code entered to the one sent to the phone; then repeat when a potentially fraudulent event occurs. *See Two-Way Media*, 874 F.3d at 1339. The ordered combination simply follows from the underlying idea of using verification codes to verify a user—*i.e.*, that the type of event warranting reverification would first need to be established and occur, and the verification code communicated to the user, before reverifying is allowed. *See Cyberfone*, 558 Fed. App'x at 993.

The record confirms that the ordered combination of verification steps was well-known and conventional in 2006. During prosecution, the PTO repeatedly rejected claims that included a single iteration of the claimed verification process using a code as obvious under 35 U.S.C. § 103. (Ex. 23 at 31-32; Ex. 24 at 8:5-54, 9:6-32; Ex. 25 at 2:48-63; Ex. 26 ¶ 0123.) The acknowledged art from the IPRs of the '920 patent family show that the ordered use of codes and communicating those codes via text or voice for verifying users was well-known. (Ex. 8 at 1-2, 5-6, 25; Ex. 20 at 9-12, 17-18; Ex. 27 at 2:67-3:4, 15:14-42; Ex. 28 ¶¶ 13-18.) Repeating the same ordered steps was equally known and conventional in 2006 as shown in the art of record in the IPRs and the PTAB's decision for the '792 patent. (Ex. 8 at 1-2, 5-6, 25; Ex. 20 at 9-12, 17-18; Ex. 27 at 2:67-3:4, 15:14-42; Ex. 28 ¶¶ 13-18). TeleSign did not appeal the PTAB's determination, and the findings are part of the intrinsic record. *Aylus Networks*, 856 F.3d at 1361; *Evolutionary Intelligence*, 2014 WL 4802426, at *4.

The state of the art in 2006 further shows that the ordered combination of steps was well-known. For example, the verification field was crowded, and by at least 2002, "send[ing] a one-time access code in an SMS to the mobile phone" in order to provide "secure entry into Web-

based applications" was in commercial use. (*See* Ex. 21, 22.).

Moreover, courts have repeatedly found that claims directed to the well-known concepts of security mechanisms, including claims reciting similar ordered steps for authenticating and verifying users using a code, do not amount to an inventive concept. For example, in *Asghari-Kamrani*, 2016 WL 3670804, at *1, the district court considered the patent eligibility of claims of a patent (U.S. Patent No. 8,266,432 (Ex. 30)) claiming priority to 2001 and describing "identification and authentication of users over a communication network such as [the] Internet" using a "dynamic code." (Ex. 30 at claim 1). The *Asghari-Kamrani* court held that the individual claim elements "describe sending data electronically, generating a random code, and comparing two pieces of data to see if they are the same," which did "no more than require a generic computer to perform generic computer functions." *Asghari-Kamrani*, 2016 WL 3670804, at *5 (internal citation omitted). And the ordered combination was simply directed to "***verify[ing] the identity of a participant to a transaction using a randomly generated code***," which was an "old method of authentication" that did not amount to an inventive concept. *Id.* (emphasis added). Using a "verification code" to verify and then reverify a user is no more inventive in the '920 patent family than it was in *Asghari-Kamrani*. *See also OpenTV*, 2016 WL 344845, at *6; *JP Morgan Chase & Co.*, 2015 WL 1941331, at *14.

### 4. TeleSign's Previous Claim Construction Arguments Do Not Bar an Ineligibility Finding

TeleSign previously raised two construction issues that it alleged impact § 101 for the '920 patent family: (1) "communicated verification code" and (2) "automated." (Dkt. No. 118 at 34.) Neither of TeleSign's construction challenges, even if correct, preclude an ineligibility finding. *E.g.*, *Bancorp Servs.*, 687 F.3d at 1277. For "communicated verification code," it appears that TeleSign interprets the term to require that the code be communicated to the registrant. (Dkt. No. 118 at 11, 34.) But requiring information to be communicated to a particular individual does not save a claim from abstraction. Communicating information— including electronically—is abstract. *Symantec Corp.*, 838 F.3d at 1311, 1314. For "automated," the term only appears in dependent claims 11 and 12 of the '920 patent. The full term is

"automated message." (Ex. 5 at claims 11, 12.) An interpretation requiring a computer to perform a step (TeleSign's apparent construction) also does not save the claims. (Dkt. No. 118 at 34.) A computer performing otherwise abstract steps is insufficient. *Alice*, 134 S. Ct. at 2360.

### 5. The Dependent Claims Also Lack Subject Matter Eligibility

TeleSign also asserts the following dependent claims: 2-13, and 19-22 of the '920 Patent; 2-12 and 14-22 of the '038 Patent; and 9 and 18 of the '792 Patent. (Dkt. No. 176-2 ¶ 65.) Although the asserted dependent claims add additional limitations, they add nothing that would alter the *Alice* analysis. For example, some claims recite that the received "electronic contact" is a phone number, that the telephonic connection is through the phone number, and that notifications are accomplished by establishing a telephonic connection. (*See* Ex. 5 at claims 2-5; Ex. 6 at claims 2, 14.) But the claims still merely recite the concepts of receiving conventional information (a phone number) and connecting a call in a conventional way (a telephonic connection), which are not patent eligible. *buySafe*, 765 F.3d at 1355; *Symantec Corp.*, 838 F.3d at 1311, 1314; *TLI Commc'ns*, 823 F.3d at 612-13. Other claims recite that an electronic message, such as a text or voice message, is sent to the registrant and that the message can contain the communicated verification code (or access to it) and/or notification of the occurrence of the notification event. (*See* Ex. 5 at claims 6-10; Ex. 6 at claims 3-5, 11, 15-16, 21.) Sending information in a conventional way—using well-known voice and text messaging—is not patent eligible. *buySAFE*, 765 F.3d at 1355; *TLI Commc'ns*, 823 F.3d at 612-13. (*See also* Ex. 20 at 9-12, 16-21; Ex. 27 at 2:63-67, 5:32-35, 10:62-11:5, 15:8-13; Ex. 28 ¶¶ 25, 39, 41; Ex. 23 at 31-32; Ex. 24 at 8:17-22, 8:31-54, 9:21-27; Ex. 25 at 2:48-63.)

Claims 11 and 12 of the '920 patent recite that the verification message is automated. (Ex. 5 at claims 11-12.) But having a computer perform a step (TeleSign's construction) that could otherwise be performed by a human—as is the case with these claims and is confirmed by the specification—is not patent eligible. *Alice*, 134 S. Ct. at 2357. (*See also* Ex. 5 at 11:57-67; Dkt. No. 118 at 34.) Claim 13 of the '920 patent recites the basic concept that a website informs the registrant that a message is being sent via the provided phone number. (Ex. 5 at claim 13.) Again, transmitting a message over a network in a typical manner—such as a message to a

user—is not subject-matter eligible. *buySAFE*, 765 F.3d at 1355. Further, notifying a user that a message is being sent is a step that can be performed by a human. *Content Extraction*, 776 F.3d at 1347; *Interval Licensing*, 2018 WL 3485608, at *9. (*See also* Ex. 5 at 11:46-56; Ex. 20 at 9-12, 16-24; Ex. 27 at 2:63-67, 5:32-35, 10:62-11:5, 15:8-13; Ex. 28 ¶¶ 25, 39, 41.)

Several claims recite examples of types of "notification events." (Ex. 5 at claims 19-22; Ex. 6 at claims 8-10, 19-20.) Specifying examples of notification events, such as event associated with a request to alter an account, does not render the claims patent eligible. *Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981). (*See also* Ex. 20 at 30; Ex. 27 at 12:56-13:23; Ex. 28 ¶ 145.) Claims 6, 7, 17, and 18 of the '038 patent recite what person is responsible for establishing notification events. (Ex. 6 at claims 6-7, 17-18.) Claiming that steps are performed by humans demonstrates that the claims are not patent eligible. *Elec. Power*, 830 F.3d at 1354-55. (*See also* Ex. 20 at 30; Ex. 27 at 11:58-12:6, 17:66-18:3; Ex. 28 ¶ 141-43.) Claims 12 and 22 of the '038 patent recite permitting an unidentified action. (Ex. 6 at claims 12, 22.) Allowing something to happen—without any detail about what or how that determination is made—is precisely the type of abstract idea that § 101 is meant to exclude. *Elec. Power*, 830 F.3d. at 1350.

Finally, claims 9 and 18 of the '792 patent recite the basic concepts of maintaining a record and associating the telephone number with other data. (Ex. 7 at claims 9, 18.)[7] Gathering, categorizing, and recording data is not patent eligible. *Elec. Power*, 830 F.3d at 1355; *Content Extraction*, 776 F.3d at 1348.

## V.   CONCLUSION

TeleSign admits that the patents are directed to preventing fraud and that preventing fraud is an abstract idea. Verifying a user's identity to prevent fraud is also abstract. None of the asserted claims supply an inventive concept that otherwise transforms that abstract idea into patent eligible subject matter. Accordingly, Twilio's motion for judgement on the pleadings should be granted under Federal Rule of Civil Procedure 12(c).

---

[7] During the '792 patent IPR, TeleSign disclaimed several dependent claims. Only two asserted claims remain: dependent claims 9 and 18. Twilio did not challenge claims 9 and 18 of the '792 patent in the IPR. (Ex. 20 at 2.)

Dated: August 14, 2018

Respectfully submitted,

BAKER BOTTS L.L.P.

*/s/ Wayne O. Stacy*
Wayne O. Stacy

Wayne O. Stacy (SBN 341579)
Sarah J. Guske (SBN 232467)
BAKER BOTTS L.L.P.
101 California Street, Suite 3600
San Francisco, CA 94111
Tel: (415) 291-6200
Fax: (415) 291-6300
wayne.stacy@bakerbotts.com
sarah.guske@bakerbotts.com

Amy K. Liang (SBN 291910)
BAKER BOTTS L.L.P.
1001 Page Mill Road, Building One
Palo Alto, CA 94304
Tel: (650) 739-7500
Fax: (650) 739-7699
amy.liang@bakerbotts.com

Michelle J. Eber *(pro hac vice)*
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002
Tel: 713.229.1223
Fax: 713.229.7923
michelle.eber@bakerbotts.com

Lauren J. Dreyer (*pro hac vice*)
BAKER BOTTS L.L.P.
The Warner, 1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
Tel: 202.639.7823
Fax: 202.639.1153
lauren.dreyer@bakerbotts.com

*Attorneys for Twilio Inc.*