SHOOK, HARDY & BACON L.L.P.
Gary Miller (Appearance *Pro Hac Vice*)
gmiller@shb.com
111 S. Wacker Drive, 51st Floor
Chicago, Illinois 60606
Telephone:  312-704-7700
Facsimile:  312-558-1195

Jesse J. Camacho (Appearance *Pro Hac Vice*)
jcamacho@shb.com
Ryan D. Dykal (Appearance *Pro Hac Vice*)
rdykal@shb.com
Mary J. Peal (Appearance *Pro Hac Vice*)
mpeal@shb.com
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone:  816-474-6550
Facsimile:  816-421-5547

Mayela C. Montenegro (SBN: 304471)
mmontenegro@shb.com
5 Park Plaza, Suite 1600
Irvine, California 92614
Telephone:     949-475-1500
Facsimile:     949-475-0016

Attorneys for Plaintiff
TELESIGN CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| TELESIGN CORPORATION, | ) | Case No. 3:18-Cv-03279-VC-SVK |
| | ) | |
| Plaintiff, | ) | Judge: Hon. Vince Chhabria |
| v. | ) | |
| | ) | **TELESIGN'S OPPOSITION TO** |
| TWILIO INC., | ) | **DEFENDANT TWILIO'S SECOND** |
| | ) | **MOTION FOR JUDGMENT ON THE** |
| Defendant. | ) | **PLEADINGS THAT THE ASSERTED** |
| | ) | **CLAIMS OF THE ASSERTED PATENTS** |
| | ) | **ARE INVALID UNDER 35 U.S.C. § 101** |
| | ) | **(ECF NO. 195)** |
| | ) | |
| | ) | Date: September 20, 2018 |
| | ) | Time: 10:00 a.m. |
| | ) | Ctrm: 4 |

# TABLE OF CONTENTS

I.    Introduction. ................................................................................................................... 1

II.   Legal Standards ............................................................................................................ 5

      A.    Motion for judgment on the pleadings under Rule 12(c) ................................... 5

      B.    Overview of patent eligibility under 35 U.S.C. § 101 ...................................... 5

III.  Objections to Evidence. ............................................................................................... 5

IV.   TeleSign's '034 Patent ................................................................................................ 7

      A.    *Alice*, Step One:  The'034 claims are not "directed to" an abstract idea. .............. 7

            1.    A meaningful "directed to" analysis must first be performed. .................. 7

            2.    Claim 1 of the '034 patent is "directed to" an improved process
                  for preventing fraudulent online registrations over a
                  communications network by registering users based on the type
                  of phone, the phone carrier, and geographic characteristics
                  associated with a received phone number. .................................................. 9

      B.    *Alice*, Step Two. ........................................................................................ 14

      C.    The '034 patent does not present an undue preemption risk. ............................ 16

V.    TeleSign's '920 Family ............................................................................................. 17

      A.    The '920 patent is not "directed to" an abstract idea. ........................................ 18

            1.    TeleSign's '920 families' claims are directed to a technical
                  improvement in online-fraud-prevention techniques. .............................. 18

            2.    Twilio's "directed to" analysis is flawed. ................................................ 20

      B.    *Alice*, Step Two. ........................................................................................ 21

      C.    The '920 patent family does not pose an undue preemption risk. ....................... 23

VI.   Conclusion ................................................................................................................. 24

## TABLE OF KEY FILINGS

| Filing | Description |
|---|---|
| ECF No. 182 | TeleSign's operative complaint |
| ECF No. 182-1 | The '034 patent (U.S. Pat, No. 7,945,034) |
| ECF No. 182-2 | The '920 patent (U.S. Pat. No. 8,462,920) |
| ECF No. 182-3 | The '038 patent (U.S. Pat. No. 8,687,038) child of '920 patent) |
| ECF No. 182-4 | The '792 patent (U.S. Pat. No. 9,300,792) child of '920 patent) |
| ECF No. 182-6 | Information disclsoure statement disclosing Twilio's first *Alice* motion to the patent offie. |
| ECF No. 195 | Twilio's opening motion |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)..................................................................................2, 25

*Alice Corp. Pty. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)................................................................................. *passim*

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016)..............................................................1, 13, 14

*BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016)..................................................................1, 22

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)................................................................. *passim*

*Chavez v. United States*,
  683 F.3d 1102 (9th Cir. 2012) ...................................................................6

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014)........................................................11, 12, 19

*Diamond v. Diehr*,
  450 U.S. 175 (1981).....................................................................................9, 22

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016)................................................................. *passim*

*Finjan, Inc. v. Blue Coat Sys.*,
  879 F.3d 1299 (Fed. Cir. 2018)................................................................. *passim*

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
  896 F.2d 1542 (9th Cir. 1989) ...................................................................5

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015).................................................................8, 21

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .....................................................................6

*Max Sound Corp. v. Google, Inc.*,
  No. 5:14-CV-04412-EJD, 2015 WL 2251060 (N.D. Cal. May 13, 2015)................................6

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
   566 U.S. 66 (2012)...........................................................................................*passim*

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
   837 F.3d 1299 (Fed. Cir. 2016)..................................................................1, 14, 16

*MyMail, Ltd. v. ooVoo, LLC,*
   313 F. Supp. 3d 1095, 1102 (N.D. Cal. 2018) ........................................................5

*O'Reilly v. Morse,*
   56 U.S. 62, 14 L. Ed. 601 (1853)..........................................................................24

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005).............................................................................7

*Rapid Litig. Mgmt. v. CellzDirect, Inc.,*
   827 F.3d 1042 (Fed. Cir. 2016)...................................................................*passim*

*Research Corp. Techs. v. Microsoft Corp.,*
   627 F.3d 859 (Fed. Cir. 2010).................................................................................9

*Tatcha, LLC v. Landmark Tech. LLC,*
   No. 16-CV-04831-WHO, 2017 WL 951019 (N.D. Cal. Mar. 10, 2017).................25

*Thales Visionix, Inc. v. United States,*
   850 F.3d 1343 (Fed. Cir. 2017)..........................................................................1, 9

*United States v. Ritchie,*
   342 F.3d 903 (9th Cir. 2003) .................................................................................6

*Wyeth v. Stone,*
   30 F. Cas. 723, F. Cas. No. 18107, 1840 U.S. App. LEXIS 534 (C.C.D. Mass.
   1840) ...................................................................................................................24

**Other Authorities**

'034 IPR. 35 ...............................................................................................................7

## I.    Introduction.

Three developments have occurred since Twilio's first *Alice* motion (ECF No. 87) was denied (ECF No. 123, October 2015) that confirm TeleSign's patents are not "directed to"[1] patent-ineligible subject matter.  First, the Federal Circuit has repeatedly confirmed that patents "directed to" improvements of existing technological processes or to specific *implementations* of an idea (instead of to an abstract idea itself) are patent-eligible.[2]  TeleSign's patents improve technological processes and claim only specific *implementations* of ideas, preventing any risk of undue preemption.  Second, the Patent Office granted TeleSign's '792 patent **after reviewing** a powerful *Alice* attack:  Twilio's own first *Alice* motion.[3]  Third, Twilio—with immense resources at its disposal[4] and despite five post-grant challenges (four IPRs and a CBM request for review)[5]—failed to convince the Patent Office that any of TeleSign's asserted claims are "known in the art,"[6] let alone "well-understood, routine, and conventional,"[7] which is harder.[8]  Having lost at the Patent Office and failed once before the court, Twilio now submits a kitchen-sink filing that attempts to

---

[1] "Directed to" is generally set off in quotations herein to indicate that it has particular and important meaning in the *Alice* analysis.  The "directed to" inquiry is a meaningful one.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).

[2] *See, e.g.*, *Enfish*; *BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016); *Rapid Litig. Mgmt. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016); *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016); *Thales Visionix, Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017); and *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299 (Fed. Cir. 2018).

[3] Compl. (ECF No. 182) at ¶¶ 46-48.

[4] *See* Twilio's Amended Answer (ECF No. 186) at ¶ 6 ("Twilio admits it is valued at over $1 billion dollars.").

[5] Twilio attempted to challenge the '792 patent's validity under Section 101 in a request for Covered Business Method ("CBM") review, but the Patent Office rejected it.

[6] The standard for obviousness under 35 U.S.C. § 103.

[7] The standard for ineligibility under 35 U.S.C. § 101.

[8] *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art.").

recast obviousness-type arguments as ineligibility arguments.  But those tests are different.  Twilio is asking the Court to find that these inventions were "well-understood, routine, and conventional" (under 35 U.S.C. § 101) even though Twilio could not convince the Patent Office they were known or obvious (under 35 U.S.C. § 103) in view of provided prior art.  The Court can (and should) disregard all of Twilio's arguments regarding the prosecution history, party briefing, and purported Patent Office findings because they are not relevant to the Section 101 inquiry.  Even if the prior art did show what Twilio contends it does, the Federal Circuit has made clear that something is not *well-understood, routine, and conventional* merely because it is disclosed in a prior-art reference.  *Berkheimer*, 881 F.3d at 1369 ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").

Thus, TeleSign respectfully requests the Court to find that TeleSign's patents claim patent-eligible subject matter under step-one of *Alice* because the Court can observe that TeleSign's claims are not directed to abstract ideas themselves.  But at the very least, Twilio's motion should be denied because what was "well-understood, routine, and conventional" in 2005/2006 is a question of fact that Twilio has failed to properly establish by appropriate clear and convincing evidence.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) ("Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact.  And in this case, that question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.").  It was frivolous for Twilio to suppose it could satisfy both *Alice* prongs.

Two patent families are at issue:  the '034 patent and the '920 patent families.[9]  The '034 patent is "directed to" an improved process for preventing fraudulent online registrations over a communications network by registering users based on the type of phone, the phone carrier, and geographic characteristics associated with a received phone number.  It improves former registration processes by implementing a specific way of preventing fraudulent online registrations

---

[9] ECF numbers are provided in the "Table of Key Filings" above:  page (iii).

even when fraudsters might be able to accurately respond to a verification-message challenge. The process prevents fake website registrations, safeguarding the public from the malicious intents of fraudsters. As reflected in claim 1 (below), this specific phone-characteristics-based implementation is expressly recited in the claims themselves, which clearly do not preempt all forms of registering users.

What is claimed is:
**1**. A process for telephonically registering a user over one or more communication networks through determining characteristics of a telephone number, comprising the steps of:
receiving a telephone number;
electronically determining the type of phone, the phone carrier and geographic characteristics associated with the telephone number;
connecting to a telephone associated with the telephone number through at least one of the communication networks;
communicating a verification message with the telephone over at least one of the communication networks; and
registering the user through at least one of the communication networks based on the type of phone, the phone carrier, the geographic characteristics associated with the telephone number and the verification message.

Claim 1 of the '034 patent.

Twilio's lead counter argument—that TeleSign's patents are directed to "detecting fraudulent account activity"—is a reference to Twilio's characterization of its own patents in a different case.[10] Twilio's attempt to shoehorn TeleSign's patents into this characterization is absurd. None of the words "detect," "account" or "activity" appear even once in the '034 patent. Rather, a benefit of the '034 patent is that its solution prevents the creation of fake accounts in the first place. If a fake account is allowed to be established unnoticed, the damage is done and the opportunity for mischief is already present. Indeed, when the methods of the '034 patent are utilized, there is no need to detect fraudulent account activity because no fraudulent accounts were allowed, further confirming the significant technological advance made by the '034 patent.

Similarly, the claims of the '920 patent family are "directed to" a technical improvement

---

[10] Twilio's opening motion includes the quotation "The idea of detecting fraudulent account activity is an abstract idea" several times. Mot. at 1, 9, and 10. That quote comes from a TeleSign brief in another case. Mot., Ex. 4 (ECF No. 195-4) at p. 6, line 3. But footnote 23 at line 2 (same page) shows that TeleSign is, in turn, actually quoting *Twilio's* complaint.

in online-fraud-prevention techniques.  The claims have a limited preemptive footprint because they are directed to a specific implementation of preventing online fraud in a particular manner that includes sending a verification code via a telephonic connection only after the occurrence of a notification event and only to a pre-verified contact, one that was formerly verified by a multi-connection process that requires receiving contact information via a website, communicating a verification code to the registrant via a telephonic connection, receiving a submitted code *via the website*, and deeming the contact information verified if the codes match.  Completely missing the point, Twilio wrongly asserts that TeleSign's patents merely perform the same process twice. Performing the same process twice would be ineffective because it would allow a fraudster to enter any number he or she wished when it really mattered: at the time of an important transaction.  The first verification sequence allows unrestricted initial contact information to be entered (for example, any phone number).  But the reverification sequence limits the sending of a second verification code to the already verified electronic contact (e.g., the formerly verified phone number).  As required by Federal Circuit precedent, this improvement of restricting the destination of a subsequent verification message to "the verified" contact (and not just any contact) is expressly claimed:

| '920 & '038 claim 1's | '792 claim 9 (dep. from 1) |
|---|---|
| after identifying the occurrence of the established notification event, re-verifying the registrant electronic contact, wherein re-verifying includes:<br>establishing a second telephonic connection with the registrant using the verified registrant electronic contact;<br><br>upon detecting an occurrence of the established notification event, re-verifying the electronic contact address, wherein re-verifying the electronic contact address includes:<br>establishing a second telephonic connection with the user using the verified electronic contact address; | upon receiving an indication of an occurrence of an established notification event, transmitting a message addressed to the verified telephone number indicating the occurrence of the notification event; and<br>-- page break --<br>receiving, from the user, an acknowledgement of an action associated with the established notification event.<br><br>**9.** The method of claim **1**, further comprising associating the telephone number with data indicating that the telephone number is verified. |

Twilio's main counter argument performs the wrong analysis, one applicable to 35 U.S.C. § 103.  Twilio attempts to show that TeleSign's claims are "known in the art"[11] by pointing to specific pieces of prior art, but even if that were true, it would not show ineligibility.  *Berkheimer*,

---

[11] Mot. at 4, 20.

881 F.3d at 1369 ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art."). Twilio's "known in the art" argument is undermined by the fact that Twilio was unable to convince the Patent Office to *institute* IPR proceedings on the '920 and '038 patents—even after rehearing requests.  Complaint at ¶¶ 444-46.  If Twilio could not convince the Patent Office that it *might* be able to show that the patents recite material that is just "known in the art," it has virtually no chance of showing that the claims recite only well-understood, routine, and conventional processes.

## II.      Legal Standards

### A.      Motion for judgment on the pleadings under Rule 12(c)

A party may move for judgment on the pleadings after the pleadings are closed.  Fed. R. Civ. P. 12(c).  "For purposes of ruling on a Rule 12(c) motion, the Court 'accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party.'"  *MyMail, Ltd. v. ooVoo, LLC*, 313 F. Supp. 3d 1095, 1102 (N.D. Cal. 2018) (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)).

### B.      Overview of patent eligibility under 35 U.S.C. § 101

The *Alice* framework is a two-part test: "first determine whether the claims at issue are directed to a patent-ineligible concept [and if] this threshold determination is met, [] move to the second step of the inquiry and 'consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.'"  *Enfish*, 822 F.3d at 1334 (quoting *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), and *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78 (2012)).

## III.      Objections to Evidence.

Under Civil L.R. 7-3(a), TeleSign objects to Twilio's exhibits 1, 3, 4, 8-12, 15-16, 18, and 21-31.  Twilio inappropriately attempts to have the Court (and TeleSign) review and respond to exhibits totaling over 1,000 pages in a motion on the pleadings. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (reversing a judgment on the pleadings because the district court went beyond the pleadings to resolve the issues). It is well established

that a Rule 12(c) motion is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6). *See Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (analysis under both standards are "substantially identical"). In a motion for judgment on the pleadings, the Court may consider only three categories of materials: "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). As explained below, the Court can ignore the aforementioned exhibits. Moreover, judicial notice (even if requested) is for *facts*, and it does not extend to party characterizations of documents outside the pleadings, such as Twilio's characterizations of Exhibits 17, 19, and 30, which can also be ignored.

There are at least five problems with Twilio's exhibits. First, judicial notice of web articles and marketing documents (Exhibits 11, 18, 21, 22, and 29) is not appropriate here. These are not "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Second, the Court can ignore Twilio's Exhibits 16 and 23 because Courts regularly find that a motion under Rule 12(c) "is not the proper vehicle to examine and interpret the prosecution history." *Max Sound Corp. v. Google, Inc.,* No. 5:14-CV-04412-EJD, 2015 WL 2251060, at *4 (N.D. Cal. May 13, 2015). Third, it is not proper to accept Twilio's self-serving characterizations of prior-art references (e.g., Exhibits 15, 24-31), as they are inaccurate or incomplete. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (reversing in part because "the court assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings."). Fourth, there is a difference between taking notice of the *existence* of pleadings from other forums and taking notice of statements within those pleadings *for the truth of what they assert*. Twilio improperly asks this Court to consider party arguments well-beyond the pleadings. The Court need not consider Twilio Exhibits 1, 3, 4, 8-10, and 12. Finally, Twilio fallaciously asks the Court to consider the *absence* of certain statements as affirmative admissions. Mot. (ECF No. 195) at 21. Faced with a limited page count, parties often focus on certain arguments to the exclusion of others. Judicial notice of party silence is not proper to show an affirmative admission. Accordingly, the Court can ignore all 22 of the Exhibits identified above.

Also, Twilio is statutorily estopped from asserting that the claims of the '034 patent are invalid as obvious based on (among other things) the art it used in the '034 IPR.  35 U.S. Code § 315(e)(2).  Despite its promise that IPR proceedings would simplify issues and its representation that "this Court would no longer have to consider certain invalidity defenses, because 35 U.S.C. § 315(e)(2)'s estoppel provision [that] would apply to Twilio based on the PTAB's final written decision,"[12] Twilio attempts to marshal hundreds of pages of IPR documents before the Court, and even brazenly cites at least seven times[13] to Exhibit 15—the primary reference (Nguyen) Twilio used in the '034 IPR.  Twilio is unquestionably estopped from relying on Exhibit 15 to show that any claimed feature is purportedly "known in the art."  Mot. at 4.

## IV.  TeleSign's '034 Patent

After a full trial on the merits, the United States Patent and Trademark Office found—in a final written decision—that Twilio failed to show that any challenged claim was invalid over the prior art.  Compl. (ECF No. 182) at ¶¶ 440-42.  Twilio could not show invalidity with a lower burden of proof (preponderance of the evidence rather than the clear-and-convincing standard), a broader claim-construction standard (broadest-reasonable-interpretation rather than the *Phillips*[14] standard), no presumption of validity, and the need to show only that claimed features were "known in the art" rather than "well-understood, routine, and conventional."  *Berkheimer*, 881 F.3d at 1369 ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").  By extension, Twilio cannot show ineligibility by resorting to similar evidence.

### A.  *Alice*, Step One:  The '034 claims are not "directed to" an abstract idea.

Twilio contends that claims of the '034 patent are "directed to" the abstract idea of "registering a user."  Mot. at 8 (heading IV.A.1.a).  Twilio is wrong.

#### 1.  A meaningful "directed to" analysis must first be performed.

---

[12] *See* ECF No. 98 at 9-10.

[13] *See* Mot. at 4, 13, 14.

[14] *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

Determining what the claims are "directed to" is critical to a proper step-one analysis.

> 'We must first determine whether the claims at issue are directed to a patent-ineligible concept.' *Alice*, 134 S. Ct. at 2355. That formulation plainly contemplates that the first step of the inquiry is a meaningful one, *i.e.*, that a substantial class of claims are not directed to a patent-ineligible concept. The **'directed to' inquiry**, therefore, cannot simply ask whether the claims **involve** a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon—after all, they take place in the physical world. *See Mayo*, 132 S. Ct. at 1293 ('**For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas**.') Rather, the 'directed to' inquiry applies a stage-one filter to claims, **considered in light of the specification**, based on whether 'their **character as a whole** is directed to excluded subject matter.'

*Enfish*, 822 F.3d at 1335 (emphasis added). Twilio engages in the exact analysis that is forbidden by Supreme Court precedent: asking whether the claims merely "involve" a patent-ineligible concept: "The only technology recited in the '034 claims **involves** 'electronically' determining and a generic 'communications network.'" Mot. at 1-2 (emphasis added).

Twilio does not perform a meaningful "directed to" inquiry. *See* Mot. at § IV.A.1.a (pp. 8-9). Twilio never considers claim 1 in its entirety, as a whole, and in light of the specification. Its step-one analysis does not make a single reference to the specification of the '034 patent; rather it dissects TeleSign's claims into constituent elements and attempts to argue that each is abstract—which is improper. *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) ("Under step one of *Mayo/Alice*, the claims are considered **in their entirety** to ascertain whether their character **as a whole** is directed to excluded subject matter.") (emphasis added). At bottom, Twilio advances unsupported attorney argument that the claims are "directed to" "registering a user."

Rather than properly analyzing what the '034 patent is "directed to," Twilio searched for an abstract idea that the patent might generally relate to. This is exactly the wrong analysis. The Supreme Court has admonished against overgeneralizing and "describing the claims at such a high level of abstraction and untethered from the language" precisely because it "all but ensures that the exceptions to § 101 swallow the rule." *Alice*, 134 S. Ct. at 2354 (noting that "we tread carefully in construing this exclusionary principle [of laws of nature, natural phenomena, and abstract ideas]

lest it swallow all of patent law"); cf. *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981) (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious").   Twilio's improper oversimplification of claim 1 does not articulate what it is "directed to" with enough specificity to ensure a meaningful step-one inquiry. *Thales Visionix*, 850 F.3d at 1347 ("We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful.").

> ### 2.   Claim 1 of the '034 patent is "directed to" an improved process for preventing fraudulent online registrations over a communications network by registering users based on the type of phone, the phone carrier, and geographic characteristics associated with a received phone number.

The claims of the '034 patent are not "directed to" an abstract idea because they recite a non-abstract improvement to computer technology:   namely an improvement in computer technology to prevent fraudulent online registrations over a communications network by registering users based on the type of phone, the phone carrier, and geographic characteristics associated with a received phone number, including when a fraudulent user can accurately respond to a verification message.   *Finjan*, 879 F.3d at 1304-05 ("Our cases confirm that software-based innovations can make 'non-abstract improvements to computer technology' and be deemed patent-eligible subject matter.") (citing *Enfish*, 822 F.3d at 1335-36); *Enfish*, 822 F.3d at 1335 ("The Supreme Court has suggested that claims purporting to improve the functioning of the computer itself, or **improving an existing technological process** might not succumb to the abstract idea exception.") (quoting *Alice*, 134 S. Ct. at 2358-59) (internal quotations removed) (emphasis added); *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) ("Indeed, this court notes that inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act.").   The '034 patent has a specific application to technology in that it prevents fraudulent website registrations.

Claim 1 expressly recites the specific aspect of registering users based on the three aforementioned phone-number characteristics.   (Claim 1 is reproduced in the *Introduction* above.)

Thus, this is not a case where certain benefits are merely described in the specification but the claims are overly broad and do not capture or are not limited by the improvement.   The specification further illuminates the technological improvement.  In 2005, when the '034 patent was filed, far fewer people were using the Internet than today.  The '034 patent recognized that "[w]ith the increasing popularity of the Internet, and website surfing and usage, both commercial and personal, it has become increasingly popular to require users to register at the website in order to obtain information from the website, order goods through the website, etc." '034 patent at 1:14-19.  The '034 patent recognized that the Internet does not allow for in-person meetings, such as at brick-and-mortar businesses. People can more easily provide false information online: "when doing business on the Internet, potential registrants often register with untraceable or false e-mail addresses and phone numbers."  '034 patent at 1:34-36.  This creates the possibility for fake website registrations, which is an enormous problem for website owners—especially owners of large website properties—in that fraudsters can use fake registrations to perpetrate any number of bad acts, including fraud, and breach security measures of website owners:  "This can compromise the intended purpose of the registration, create a breach of security and constitute fraud on the website owners." '034 patent at 1:36-38.

The '034 patent also recognized that a fraudster might be able to circumvent a verification technique that relies on the fraudster having access to a phone to receive a challenge message because new technologies, like VOIP (Voice Over Internet Protocol), could provide a way for fraudsters to receive the verification messages.  VOIP, in a nutshell, allows telephone calls to be placed over the Internet instead of traditional telephone lines, referred to as POTS (plain old telephone service).  Historically, persons had access to only one, maybe two, or a few phones.  But VOIP makes it possible for fraudsters to obtain a group of phone numbers for few dollars each. Fraudsters could buy 100 VOIP numbers, sign up for 100 fake accounts, and still have access to 100 challenge codes sent to each phone number via a verification process.  The '034 patent recognized that the advent of these new types of systems could allow fraudsters to circumvent verification challenges that required access to a phone: "However, it has been found that with the advent of different telephone systems, such verification can still lead to access by fraudulent

users." '034 patent at 1:44-46.

This problem "specifically" arose in the realm of computer networks and presented a challenge "particular to the Internet." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014). The problem of fraudulent website registrations did not exist before there were websites. And the advent of different telephone systems, such as VOIP, could allow fraudsters to provide fake information about themselves, such as their physical location, etc. '034 patent at 1:46-63.

How could fake website registrations be prevented even though fraudsters might be able to accurately respond to challenge requests sent as part of a two-factor authentication process? The '034 patent describes one way: an improvement to existing technology in which a system determines the type of phone, the phone carrier and geographic characteristics associated with a telephone number provided by a user and then bases registration on those characteristics (along with a verification message). Phone numbers were conventionally used as a way to contact users. But the '034 patent describes an unconventional use of provided phone numbers: as a way to obtain information about the user and then register a user based on that information. '034 patent at 3:58-62 ("The present invention provides a process for verifying an online registration, or at least the true identity of the registrant's telephone number so as to provide an additional layer of security and reduce fraud.").

If registration were performed according to conventional processes, a user's phone number would not be analyzed and used as an authentication basis when registering a user. The solution provided by the '034 patent helps prevents fraudulent website registrations, security breaches, inappropriate uses of websites, and any other harm that stems from a user being able to create fake website accounts. For example, perhaps a website owner determined that phone numbers associated with VOIP phone types indicate a user who is too risky to be allowed to register. The '034 patent—by considering the phone type during registering—provides a way to prevent (or flag) such a registration. This is captured in claim 4 of the '034 patent.

Thus, the claims of the '034 patent recite an improved technological process that prevents fraudulent website registrations; in this way they are similar to claims that the Federal Circuit has

found patent-eligible. In *DDR*, the Federal Circuit held that DDR's patent claimed a technical solution to a problem unique to the Internet—websites instantly losing views upon the click of a link, which would send the viewer across cyberspace to another company's website. *DDR Holdings*, 773 F.3d at 1248-50.  The claimed invention solved that problem in a particular, technical way by sending the viewer to a hybrid webpage that combined visual elements of the first website with the desired content from the second website that the viewer wished to access. *Id.* at 1257-59.  The *DDR* claims—as with those of the '034 patent—"do not recite a mathematical algorithm [n]or do they recite a fundamental economic or longstanding commercial practice."  *Id.* at 1257.

Twilio makes economic-related arguments similar to those made by the challenger in *DDR*: "The '034 patent does not address a problem rooted in technology and does not improve computer technology. It instead addresses a business problem—detecting fraudulent activity."  Mot. at 10. First, that assertion is belied by the fact that Twilio did not request a Covered Business Method (CBM) review of the '034 patent, as it did for the '792 patent.  Second, the '034 patent *does* address a problem rooted in technology:  preventing fraudulent website registrations and online security breaches as explained above.  Third, even if the problems did address a business challenge, the claims are patent eligible because they are "directed to" "a challenge particular to the Internet." *DDR Holdings*, 773 F.3d at 1257.

These claims stand apart from claims directed to abstract ideas because, like the claims at issue in *DDR*: "they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."  *Id.* at 1257.  There were no websites, and thus no fake-website registrations before the Internet.  The claimed solution is to base online registering on the electronically determined phone type, carrier, and geographic characteristics of a received phone number.

In *Enfish*, the Federal Circuit held claims "directed to" a self-referential logical model for a computer database patent-eligible under step one of *Alice*. 822 F.3d at 1330. The disclosed

technique enabled faster searching and more effective storage of data than previous methods. *Id*. at 1333. The claims were "not simply directed to any form of storing tabular data, but instead are specifically directed to a self-referential table for a computer database" that functions differently than conventional databases. *Id*. at 1337. *Enfish* confirmed that patent-eligible improvements are not limited to a computer itself, but to improvements of existing technological processes. *Id.* at 1335 ("The Supreme Court has suggested that claims 'purport[ing] to improve the functioning of the computer itself,' or 'improv[ing] an existing technological process' might not succumb to the abstract idea exception.") (citing *Alice*, 134 S. Ct. at 2358-59). As in *Enfish*, the '034 claims improve the technological process of preventing fraudulent registrations over communications networks, particularly when fraudsters might be able to accurately respond to verification messages, and the claims do so in a specific way—not *all* ways.

*Amdocs* further illustrates that patents directed to unconventional technological solutions are patent-eligible. *Amdocs*, 841 F.3d at 1291. The patents in *Amdocs* concerned "parts of a system designed to solve an accounting and billing problem faced by network service providers." The Federal Circuit found that the "claim entails an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases). The solution requires arguably generic components, including network devices and 'gatherers' which 'gather' information. However, the **claim's *enhancing* limitation** necessarily requires that these generic components operate in an unconventional manner to achieve an improvement in computer functionality." *Amdocs*, 841 F.3d at 1300-01 (emphasis added). Here, the claim's "registering based on" limitation necessarily requires that any purportedly generic components operate in an unconventional manner to achieve an improved fraud-prevention technique.

*Finjan* is also relevant because it dealt with virus scanning of a computer:

> 1. A method comprising:  receiving by an inspector a Downloadable; generating by the inspector a first Downloadable security profile that identifies suspicious code in the received Downloadable; and linking by the inspector the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients.

*Finjan*, 879 F.3d at 1303. *Finjan* confirms that claims need not expressly recite a computing system, memory, display, etc., *per se* for the claims to be held "directed to" an "improvement in computer functionality." *Id.* at 1304 ("The question, then, is whether this behavior-based virus scan in the '844 patent constitutes an improvement in computer functionality. We think it does."). Just as the method of Finjan's claim 1 enabled "a computer security system to do things it could not do before," so too does claim 1 of the '034 patent enable a computer security system to do things it could not do before: namely, prevent fraudulent website registrations even when a user might be able to accurately respond to a verification message, by basing registration on the three recited phone-number characteristics.

     **B.**    *Alice*, **Step Two.**

Because claim 1 of the '034 patent is not "directed to" an abstract idea, the Court does not need to proceed to *Alice's* step-two analysis. "If the claims are not directed to an abstract idea, the inquiry ends. If the claims are 'directed to' an abstract idea, then the inquiry proceeds to the second step of the *Alice* framework." *McRO*, 837 F.3d at 1312. We provide a step-two analysis for completeness, adopting—solely for purposes of the analysis—Twilio's erroneous contention that that claim 1 is directed to the abstract idea of "registering a user."

"Under step two, claims that are 'directed to' a patent-ineligible concept, yet also improve an existing technological process, are sufficient to transform the process into an inventive application of the patent-ineligible concept." *Rapid Litig. Mgmt*, 827 F.3d at 1050 (citing *Alice* and *Mayo*, internal quotation marks omitted). As explained above, the claims of the '034 patent improve the technological process of registering users over communications networks by basing such registration on the type of phone, phone carrier, and geographic characteristics of a phone number provided by a user when registering.

Because TeleSign provided a detailed analysis above, for the sake of brevity, it will not repeat it here. *Amdocs*, 841 F.3d at 1294 ("Whether the more detailed analysis is undertaken at step one or at step two, the analysis presumably would be based on a generally-accepted and understood definition of, or test for, what an 'abstract idea' encompasses."). In brief, to overcome the disadvantage of potential registrants providing false information to circumvent a verification-

message process ("it has been found that with the advent of different telephone systems, such verification can still lead to access by fraudulent users"),[15] the '034 patent registers users based on the type of phone, carrier, and geographic characteristics associated with a user-provided phone number.   In this way, fraudulent registrations can be prevented when, for example, the characteristics are associated with attributes indicating fraud (e.g., VOIP phone types—as expressly recited in claim 4, locations associated with fraud, etc.).

Twilio again breaks the claim down into its constituent components instead of considering them as a whole. *Rapid Litig. Mgmt*, 827 F.3d at 1051 ("That is not to say, however, that all process claims that employ only independently known steps will be unpatentable.  To the contrary, in examining claims under step two, we must view them as a whole, considering their elements 'both individually and 'as an ordered combination.'" Even if Twilio were right that each step is well known, that does not mean a claim is not patent-eligible.  *Id.* ("Thus, 'a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made.'") (quoting *Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1298; and *Diehr*, 450 U.S. at 188).

The ordered combination of steps in claim 1 provide an "inventive concept" that would transform the claim into a patent-eligible invention if the abstract idea were, as Twilio contends, "registering a user"—and in particular, the second and last elements, which collectively operate to electronically determine the recited phone-number characteristics in real time and then register a user based on them (and the verification message).  This is significantly more than merely "registering a user" in the abstract.  Twilio attempts to argue that it was known in the art to register users based on two characteristics by citing to the extra-pleading IPR record.  That is an issue of fact and Twilio is wrong.  The IPR was a lengthy proceeding, and Twilio is selectively choosing quotations and characterizing silence as an admission.  Twilio's failed IPR had numerous shortcomings. TeleSign's decision to focus its responses on Twilio's most prominent deficiencies should not be read as concessions that minor issues were not contested.

---

[15] '034 patent at 1:44-46.

As stated in the introduction, Twilio's arguments focus on the wrong analysis: trying to show that purported features are known in the art. That is potentially relevant to obviousness, not patent eligibility. Twilio's factual contention that the PTAB purportedly "found that registering users based on characteristics of a phone number was **known in the art**"[16] only shows that Twilio is attempting an end run around the estoppel provisions of 35 U.S.C. § 315, as explained above. Twilio has not shown that claim 1 (as a whole) of the '034 patent only claims well-understood, routine, and conventional processes. As in its failed IPR, here Twilio cannot show TeleSign's patent was known in the art.

TeleSign's claims are not "directed to" the abstract idea of registering, but rather to a specific *implementation* of registering a user in a manner that was unconventional in 2005: registering based on the determined carrier, phone type, and geographic characteristics of a received phone number as well as on a verification message, thereby providing a solution to a problem rooted in computer technology (preventing fraud in networking environments, such as the Internet, where an anonymous user is not physically present and could still accurately respond to a verification message)—and are therefore patent eligible. *See e.g., Enfish*, 822 F.3d at 1339 (finding claims patent-eligible because "the claims are directed to a specific implementation of a solution to a problem in the software arts.").

### C. The '034 patent does not present an undue preemption risk.

"The concern underlying the exceptions to § 101 is not tangibility, but preemption." *McRO*, 837 F.3d at 1315 (citing *Mayo*, 132 S. Ct. at 1301). The abstract-idea exception prevents patenting a result where "it matters not by what process or machinery the result is accomplished." *Id*. at 1312 (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113, 14 L. Ed. 601 (1853)). That concern is not present here. Clearly, claim 1 would not prevent the result of "registering a user." The claims are not "directed to" *any* method of registering users, but instead are specifically directed to an improved technique that bases registering of users on certain determined phone-number characteristics associated with a provided telephone number. *Enfish*, 822 F.3d at 1337 ("Here, the claims are not

---

[16] Mot. at 4 (emphasis added).

simply directed to any form of storing tabular data, but instead are specifically directed to a self-referential table for a computer database.")

## V.   TeleSign's '920 Family

Twilio itself has conceded the specificity of TeleSign's claims. When arguing that its products did not infringe, Twilio maintained that TeleSign's patents have "**dozens of specific steps**"[17] and reiterated in later briefing that "[e]ach of the patents asserted here requires **very specific** steps."[18]  Twilio should not be allowed to vary its positions based on self-interest. Claim 1 reproduced (right) for context.

The '792 patent is a child of the '038 patent, which is child of the '920 patent—all sharing a common specification.  Persuasive evidence that these patents are patent eligible is that the United States Patent and Trademark Office granted the '792 patent even after it reviewed Twilio's robust, first *Alice* motion.  *See* Compl. at ¶¶ 46-48, Ex. F (reproduced, in part, below).

What is claimed is:
1. A verification and notification process, comprising:
receiving information responsive to at least part of a registration form that is presented to the registrant on a web-site, the received information including at least one registrant electronic contact;
verifying a received registrant electronic contact, wherein verifying the received registrant electronic contact includes:
establishing a first telephonic connection with the registrant using the received registrant electronic contact;
communicating a first communicated verification code to the registrant through the first telephonic connection; and
receiving a first submitted verification code after it is entered by the registrant via the web-site and verifying the received registrant electronic contact if the first submitted verification code is the same as the first communicated verification code;
establishing a notification event associated with the registrant;
identifying an occurrence of the established notification event; and
after identifying the occurrence of the established notification event, re-verifying the registrant electronic contact, wherein re-verifying includes:
establishing a second telephonic connection with the registrant using the verified registrant electronic contact;
communicating a second communicated verification code to the registrant through the second telephonic connection;
receiving a second submitted verification code that is entered by the registrant via the web-site; and
re-verifying the registrant electronic contact if the second submitted verification code is the same as the second communicated verification code.

*Claim 1 of the '920 patent (Compl. Ex. B—ECF No. 182-2)*

---

[17] ECF No. 27 at 20:27-21:1 (emphasis added).

[18] ECF No. 61 at 2:22-23 (emphasis added).



*Annotated Compl. Ex. F (ECF No. 182-6) at 3.*

That is no small fact:  the Patent Office not only considered the '792 claims patent-eligible, but it reviewed Twilio's best arguments, and issued the patent over those arguments.  The Patent Office's Section 101 blessing can be imputed to the '038 and '920 patents given their similarities, which Twilio concedes and relies on.  Mot. at 17.  The results of Twilio's post-grant challenges further confirm patent eligibility.  Twilio did not even attempt to challenge claims 9 and 18 of the '792 patent in IPR (Compl. at ¶ 447), which both recite "associating the telephone number with data indicating that the telephone number is verified"—a feature that relates to the importance of initial verification in the context of subsequent verifications.  The Patent Office denied Twilio's requests to institute IPRs on the '920 and '038 patents (Compl. at ¶ 444), finding an unlikelihood of success that any claim would be shown invalid.  Twilio's requests for rehearings were denied (Compl. at ¶¶ 445-46), as was Twilio's request for Covered Business Method ("CBM") review of TeleSign's '792 patent: finding that its primary purpose does not relate to finance and that CBM review is not appropriate for "technological inventions" (Compl. at ¶¶ 449-52), intimating that these patents are indeed directed to technological inventions.

### A.    The '920 patent is not "directed to" an abstract idea.

#### 1.    TeleSign's '920 families' claims are directed to a technical improvement in online-fraud-prevention techniques.

Examining the specification and considering the claims as a whole leads to the conclusion that the claims of TeleSign's '920 family are "directed to" a technical improvement in online-fraud-prevention techniques.   The improvement helps prevent fraud in online environments

incident to the occurrence of a notification event by sending a verification code via a telephonic connection only to a pre-verified contact and one that was formerly verified by an unconventional looped, multi-connection process that requires receiving contact information *via a web-site*, sending a verification code to the registrant via a telephonic connection, receiving a submitted code *via the website*, and deeming the contact information verified if the codes match.

The '920 family explains that: "when doing business on the Internet, potential registrants often register with untraceable or false e-mail addresses and phone numbers. This can compromise the intended purpose of the registration, create a breach of security and constitute fraud on the web-site owners." '920 patent at 1:34-38.  Thus, just as in *DDR*, the problem is "a challenge particular to the Internet" because people provide false information online, in which authentication is expected to occur in real time, therefore "specifically arising in the realm of computer networks." *DDR Holdings*, 773 F.3d at 1257.

The patents further explain:  "to prevent fraud or identity theft, either the business or individual may wish to be alerted to certain events. For example, a consumer may wish to be notified every time a withdrawal or more than one thousand dollars is requested from his checking account, or charged to his credit card." '920 patent at 1:41-44.  Thus, there is a need for a method of verifying a registrant's identity, such as through the registrant's telephone number and a continuing need for a method to notify a registrant, such as through the registrant's telephone number, of events which are established either by the individual registrant or the company through which the registrant is conducting services.  '920 patent at 1:62-2:1.

In light of the specification and when considered as a whole, claim 1 of the '920 patent is not "directed to" the abstract idea of "verifying a user—twice" as Twilio contends.  If the same set of steps were merely performed twice, that would frustrate security and surely not fall within the scope of TeleSign's claims.  Twilio misses the importance of limiting re-verifying to a first-verified contact (among other things).  The patents recognized the shortcoming in the art that allowed open-ended entries of phone numbers, which could lead to a security breach if a code is permitted to be sent to a *newly provided* phone number.  Thus, the '920 patent family describes and claims a system opposite of what Twilio's contends.  TeleSign's patents do *not* perform the

same verification process twice.  To the contrary, the '920 patent family describes a first process of establishing a verified contact, such as a telephone number.  That process "verif[ies] an on-line registration by a telephone connection separate from the on-line connection between the web-site and potential registrant."  '920 patent at 1:8-10.  But importantly, when an established event occurs, a user is prevented from inputting contact information when re-verifying. Instead, the user "must receive a verification call at one of the phone numbers previously stored in the account." '920 patent at 9:4-6.

The patented process only occurs after the occurrence of established notification events. Twilio responds that the claims "do not receive any special technical process for establishing the events" (Mot. at 18), but that is not required for a claim to be patent-eligible.  Twilio ignores the claim as a whole, and the fact that the subsequent verification only takes place after the occurrence of the notification events.  Twilio is not considering the claim as a whole.

Twilio's only argument that TeleSign's '920 family is not directed to a technical solution relies on inadmissible evidence and ignores key aspects of TeleSign's claims.  Mot. at 18-20; also *id.* at 1, 6.  Twilio inappropriately relies on an extra-pleading, unauthenticated, inadmissible, document (Twilio's Ex. 11)—a supposed email that Twilio characterizes as a press release, and stating—or at least implying—that it is from "the inventor" (Mot. at 19) even though the purported author (Mr. Berkovitz) is not a named inventor of any patent in the '920 family.  This document has no place in Twilio's motion, especially to prove the truth of any matter asserted in the email. TeleSign objects to it, as explained above.  TeleSign will more fully address any admissible aspect of this document through its evidentiary showing, but suffice it to say the apparent intent of the document was to convey the benefits of a new technological improvement to a lay audience unfamiliar with the improved technique precisely because it was unconventional.  The Wright brothers would not have precluded patentability of their invention had they explained to a lay audience that birds have had a solution to flying for years, and they transferred the concept of lift to a modern-day machine.  Just as their airplane was not directed to lift itself; TeleSign's patents are not directed to the concept of user verification itself.

**2.      Twilio's "directed to" analysis is flawed.**

Twilio contends that the claims of the '920 patent family are directed to the abstract idea of "verifying a user—twice."  Twilio again fails to perform the required "directed to" inquiry, which—as explained above—requires considering the claims "in light of the specification" and "their character as a whole." *Enfish,* 822 F.3d at 1335.  Twilio makes absolutely no reference to the patents' specifications and ignores the claims as a whole, again attempting to dictate a result by baldly contending that all of the claims are directed to "verifying a user—twice."  Twilio's supporting analysis consists of inappropriately dissecting the claims into constituent parts and commenting on the eligibility of each limitation.  *Internet Patents*, 790 F.3d at 1346 ("Under step one of *Mayo/Alice*, the claims are considered **in their entirety** to ascertain whether their character **as a whole** is directed to excluded subject matter.") (emphasis added).

Even if Twilio were right that the claims are "directed to" performing a process twice—which it is not—Twilio is wrong to conclude that that this compels a patent-ineligibility finding.  The Federal Circuit rejected that rationale in *Rapid Litig. Mgmt*, 827 F.3d at 1051. There, the court held that the repetition of even known steps was far from routine and conventional. *Id*. Here Twilio argues that performing a supposedly known process twice renders that process ineligible and that "TeleSign's **simple** identity verification process does not solve a technical problem" (Mot. at 2) (emphasis added). The Federal Circuit rejected similar arguments:  "[T]he crux of LTC's argument seems to be that, once it was discovered that hepatocytes could survive multiple freeze-thaw cycles, it would have been a **simple** task to repeat the known freeze-thaw process to arrive at the claimed invention. But patent-eligibility does not turn on ease of execution or obviousness of application. Those are questions that are examined under separate provisions of the Patent Act." *Rapid Litig. Mgmt.*, 827 F.3d at 1052 (citing *Mayo*, 132 S. Ct. at 1304) (emphasis added).

## B.     *Alice,* Step Two.

Because the '920 families' claims are not directed to an abstract idea, the Court need not proceed to *Alice's* step-two analysis.  We provide a step-two analysis for completeness, adopting—solely for purposes of the analysis—Twilio's erroneous contention that that the claims are "directed to" the abstract idea of "verifying a user—twice."

One can readily observe from the claim that it is "directed to" an *implementation* of a

verification and notification process, not to the idea of verification itself.  As the Federal Circuit found in *Finjan*, TeleSign is not attempting to claim the mere result of verification; rather, the patents provide specific steps defining one implementation of a verification process.  *Finjan*, 879 F.3d at 1305-06 ("Here, the claims recite more than a mere result. Instead, they recite specific steps—generating a security profile that identifies suspicious code and linking it to a downloadable—that accomplish the desired result.").

Twilio again improperly applies the obviousness standard, arguing that the prosecution history shows that TeleSign's '920 family claims are purportedly "known in the art" (Mot. at 20). Twilio's analysis cannot show ineligibility. The question of "whether a particular invention is novel is wholly apart from whether the invention falls into a category of statutory subject matter." *Diamond*, 450 U.S. at 189 (internal citation omitted).  Because this is a § 101 motion addressing patent-eligibility the Court need not credit Twilio's arguments grounded in the patents' prosecutions or IPR proceedings.  *BASCOM*, 827 F.3d at 1350 (disagreeing with the district court's analysis, finding it improperly "looks similar to an obviousness analysis under 35 U.S.C. § 103[.]").

Twilio then focuses its analysis on individual claim elements with only conclusory analysis of the claims as a whole, which is improper. *See, e.g.*, *BASCOM*, 827 F.3d at 1350 ("The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."); *Rapid Litig. Mgmt.*, 827 F.3d at 1051 ("To the contrary, in examining claims under step two, we must view them as a whole, considering their elements 'both individually and '**as an ordered combination**.' *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1298). Thus, 'a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diehr*, 450 U.S. at 188.") (emphasis added).

As an ordered combination, Twilio belittles the significance of the recited "notification event" limitations as well.  Twilio states that "the claims do not recite any special confirmation" for them, but that is not required.  Rather, that they are included, that the subsequent verification

does not occur until after the occurrence of a notification event, and when it does occur—as will be explained more below—the subsequent verification restricts where the verification message may be sent (only to the pre-verified number) recites a patent-eligible ordered combination.

Twilio mischaracterizes the IPR records and relies on an absence of argument to show affirmative statements. Twilio also cites to the IPR record of the '792 patent while purportedly analyzing the '920 patent, even though the Patent Office refused to conduct an *inter partes* review of the '920 patent. Mot. at 21. TeleSign will not rehash the voluminous IPR records here nor balloon the Court's docket with counter exhibits. TeleSign disputes Twilio's characterizations. As explained above, the Court may properly—and should—ignore Twilio's evidence in the context of this Rule 12(c) motion.

The remainder of Twilio's step-two analysis is unpersuasive: Twilio completely ignores the entire "re-verifying" sequence of steps. Mot. at 21. Instead, Twilio subtly utilizes a pair of brackets to change the meaning of claim 1 of the '920 patent so that it seems like the claims repeat the same process.

> The elements reciting the step of "[re]verifying" that the "received" code is the same as the "communicated" code (elements 1[c][iii] and 1[f][iv]) are directed at comparing information.

*ECF No. 21 at p. 21 – reflecting Twilio's mischaracterization of '920, claim 1.*

Twilio completely misses an important aspect of TeleSign's claims: that a first process is used to verify a registrant's contact information, and then after the occurrence of notification events, re-verification is restricted to sending a verification code ***only*** to the already-verified contact information. Twilio ignores this feature even though it is found in every claim of every patent in the '920 family. Twilio should not be allowed to supplement this deficiency in Reply, leaving TeleSign no way to respond to a new argument. This is Twilio's third try. It either does not understand TeleSign's claims or is misrepresenting them to the Court. Its step-two analysis did not consider each element, and therefore could not have considered the claim as a whole.

### C.     The '920 patent family does not pose an undue preemption risk.

The judicial exception in patent law against claiming abstract ideas dates as far back as

1840. *See Wyeth v. Stone*, 30 F. Cas. 723, F. Cas. No. 18107, 1840 U.S. App. LEXIS 534 (C.C.D. Mass. 1840). In *Wyeth*, the patent described a particular apparatus for cutting ice, as well as a multi-step process for using the inventor's apparatus to cut ice. The patent specification recited two claims, with one claim "for the particular apparatus and machinery to cut ice, described in the specification." But the patentee also tried to claim "an exclusive title to the art of cutting ice by means of any power, other than human power." *Id*. That was not allowed; no one can have a right to cut ice by all means and methods.

Famed inventor Samuel Morse also went too far with one of his claims: "Samuel Morse was granted several patent claims, but his broadest claim, the eighth claim, encompassed the use of electro-magnetism, however developed, for making or printing intelligible characters, letters, or signs, at any distances. Opining that this claim was too broad, and not warranted by law, the Court observed that if this claim can be maintained, it matters not by what process or machinery the result is accomplished." *Interval Licensing LLC v. AOL*, Inc., 896 F.3d 1335 (Fed. Cir. 2018) (citations and internal quotations removed to *O'Reilly*, 56 U.S. 62).

Unlike Wyeth's and Morse's unacceptable claims, the process by which verification occurs in '920 family claims *do* matter, confirming eligibility. TeleSign is not laying claim to the mere end result of online verification. Claim 1 of the '920 patent, on its face, requires a set of specific steps to implement a particular process of verification.

## VI.   Conclusion

This Court cautioned Twilio to not bring a frivolous motion after having already lost a first one. Despite that warning, Twilio jettisoned the rules and brought its motion for judgment on the "pleadings" with prolific citations to objectionable evidence—an approach that itself tends to show that TeleSign's claims are not directed to patent-ineligible subject matter. TeleSign lacks the pages to refute or respond to each misstatement or mischaracterization Twilio makes. Perceived lack of responses to specific allegations should not be read as acquiescence.

Twilio brings up claim construction but withholds identifying which terms it will seek constructions on and what those will be. TeleSign has prepared this brief based on certain constructions, but is being denied the benefit of knowing what constructions Twilio will pursue.

Undoubtedly, Twilio will propose narrow constructions to avoid infringement, but narrow constructions also support a finding of patent-eligibility. This is one reason why courts often do not rule on such *Alice* motions before claim construction and also one reason Twilio's first motion was denied.  ECF No. 123 at 3. *See also Tatcha, LLC v. Landmark Tech. LLC*, No. 16-CV-04831-WHO, 2017 WL 951019, at \*6 (N.D. Cal. Mar. 10, 2017) (denying a motion for judgment on the pleadings under § 101 because the Court "would benefit from claim construction and a fuller factual record.").

Invalidating the asserted claims of four of TeleSign's patents is an extraordinary act, particularly given the events described in the introduction recounting the tests TeleSign's patents have withstood.  Even if the Court disagrees that TeleSign's patents are directed to patent-eligible subject matter, TeleSign has at least shown that issues of fact—particularly, what was "well-understood, routine, and conventional"—preclude granting Twilio's motion.  *Aatrix Software*, 882 F.3d at 1128; *Berkheimer*, 881 F.3d at 1369.  But TeleSign requests that the Court not only find Twilio's motion deficient, but affirmatively find that TeleSign's patents are not directed to patent-ineligible subject matter, thereby ending the *Alice* inquiry at the trial level.

Dated:  August 28, 2018                    SHOOK, HARDY & BACON L.L.P.


                                           By: _____/s/ Jesse J. Camacho_____
                                           SHOOK, HARDY & BACON L.L.P.
                                           Gary Miller (Appearance *Pro Hac Vice*)
                                           gmiller@shb.com
                                           111 S. Wacker Drive, 51st Floor
                                           Chicago, Illinois 60606
                                           Telephone:  312-704-7700
                                           Facsimile:  312-558-1195

                                           Jesse J. Camacho (Appearance *Pro Hac Vice*)
                                           jcamacho@shb.com
                                           Ryan D. Dykal (Appearance *Pro Hac Vice*)
                                           rdykal@shb.com
                                           Mary J. Peal (Appearance *Pro Hac Vice*)
                                           mpeal@shb.com
                                           2555 Grand Boulevard
                                           Kansas City, Missouri 64108
                                           Telephone:  816-474-6550
                                           Facsimile:  816-421-5547

                                           Mayela C. Montenegro (SBN: 304471)
                                           mmontenegro@shb.com
                                           5 Park Plaza, Suite 1600
                                           Irvine, California 92614
                                           Telephone:     949-475-1500
                                           Facsimile:     949-475-0016

                                           Attorneys for Plaintiff
                                           TELESIGN CORPORATION